PRESSLEY *v.* STATE

[No. 506, September Term, 1965.]

*Decided December 13, 1966.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*John R. Hargrove* for appellant.

Submitted on the brief by *Robert C. Murphy, Attorney General, Fred Oken, Assistant Attorney General, Charles E. Moylan, Jr.* and *Stanley S. Cohen, State's Attorney* and *Assistant State's Attorney for Baltimore City,* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

We have before us the appeal of Melvin L. Pressley (Pressley) who at 2:40 A.M. on 13 December 1964 fired two bullets into Mayfield Powell's chest. For this seemingly senseless killing a jury, 10 months later, found him guilty of first degree murder without capital punishment. He contends, first, that the evidence is insufficient to sustain his conviction. Next he urges us to set aside the verdict of the jury because two of the witnesses who gave testimony against him were not "named in the indictment" nor did they testify at the preliminary hearing.

Early in the evening (12 December) Pressley, his wife, their five children and her uncle from New York went to 1720 Mc-

Culloh Street where her mother occupied the second floor apartment. Some time after their arrival Mrs. Pressley told the appellant to take her uncle out and "show him around town." As Pressley told it, "We went to a couple of bars, drank a few beers, and the time became late." Pressley left the uncle and returned to his mother-in-law's apartment. It was then a little after 2:00 A.M. Annoyed because the children had been left alone he went down to the first floor apartment occupied by Lucinda Gray. There he found his wife and his mother-in-law. He rebuked his wife for leaving the children "upstairs by theirself." Incensed by her profane reply he "smacked" her. Whereupon his mother-in-law jumped up and belted him. When he "shoved * * * [her] out of the way" Mayfield Powell (Lucinda Gray's brother) started "banging on * * * [him] with his fists." After Lucinda joined the affray, Pressley continued, Powell cut him slightly on the head. Pressley then shot once to "scare him away" but Powell "kept coming." After the fatal shots were fired he went to Frank Quarles' house.

According to Lucinda Gray when Pressley "hit his wife beside the head real hard" Powell told him "to take it outside in the hall." Pressley then "made an attack, and he scuffled a little bit." When the "scuffle" subsided Lucinda walked to the front door with Pressley where she saw him get into his car and drive off. She returned to her apartment and "went to the bathroom." About ten minutes later Pressley returned. As she related it "he kicked my door open. I yelled 'Who's that?' He didn't give an answer, so * * * as I opened the bathroom door he had the pistol in my face and it shocked me at the time, but he shot. When he shot, I jumped back in the bathroom." Later she saw him fire two shots at her brother who, at the time, she said, was unarmed.

William Clay Edwards, a brother-in-law of Powell who lives in Washington, was produced as a rebuttal witness by the State. He was present in Lucinda Gray's apartment when Pressley, whom he did not know, came in and started "arguing" with his wife. He and Powell "stopped the scuffling" and Powell told him "to take it outside." Pressley left, he said, but came back in about fifteen minutes, kicked open the door, fired a shot and when Powell came out of his mother's room he shot him. He did not see a knife or weapon of any kind on Powell.

It was not long before the police knocked on Frank Quarles' door. He told them "there was nobody there" but when they told him the purpose of their visit he admitted them. Officer Hedgepath discovered Pressley standing in the bathtub behind the shower curtain. As he stepped out of the tub his mother-in-law (another sister of Powell), who had come with the police, said "that is Melvin, he is the one that shot him." The officer testified that Pressley replied, "All right, I shot—Okay, you got me." Although the police said they found no evidence of any cuts or blood on the appellant, Pauline Quarles testified her husband had applied some alcohol to his head and wiped some blood off of his face with a towel. Officer Buccini found the gun under some dirty clothes on the bathroom floor. It is conceded this was the gun from which were fired the bullets that killed Powell.

I.

At the close of all the evidence Pressley moved for a judgment of acquittal pursuant to Maryland Rule 755 b. He is therefore entitled to have this Court review the evidence to determine its sufficiency. *Tull v. State,* 230 Md. 152, 186 A. 2d 205 (1962). Whether the State has proved its case beyond a reasonable doubt is an inquiry we need not undertake because our review, in these circumstances, is limited to ascertaining the presence of any relevant evidence, properly before the jury, which would sustain Pressley's conviction. *Tull v. State,* 230 Md. 596, 188 A. 2d 150 (1963). To set aside the jury's verdict we must be able to say there was no legally sufficient evidence from which the jury could find him guilty beyond a reasonable doubt. *Wright v. State,* 222 Md. 242, 159 A. 2d 636 (1960). This we cannot say. Pressley admitted the killing and, in respect of his claim that he did it in self-defense, the jury was not obliged to believe that Powell attacked him with a knife and cut him, especially in light of the testimony of two eyewitnesses who said Powell did not have a knife. As to his bleeding there is a conflict. Pressley's testimony is supported to some extent by Pauline Quarles but the police and the eyewitnesses saw no blood. Indeed, the cut on his head must have been no more than a scratch because even Pressley admitted the application of some rubbing alcohol took care of it. As we have many times said

the credibility of witnesses is primarily for the determination of the trier of facts. *McDowell v. State,* 231 Md. 205, 211, 189 A. 2d 611 (1963). As to the existence of premeditation we think there is quite enough in the evidence to support a finding that Pressley did have a wilful design to murder, that the element of deliberation, a full and conscious knowledge of the purpose to kill, was present in his mind, and that there was an appreciable length of time before the killing in which he could have reflected on the act he was about to commit, and make a deliberate choice to kill or not to kill. *Dunn v. State,* 226 Md. 463, 476, 174 A. 2d 185 (1961). The jury was entitled to believe that Pressley's return to the apartment where only a few minutes earlier he had gotten into "a scuffle" was deliberate, that he was looking for trouble, that he was loud, aggressive and belligerent, that his announced purpose was to find "the man who had pushed him," that what he intended to do to him was unmistakably advertised by his first shot.

## II.

Pressley, in his brief, objects "to the use of Lucinda Gray and Billy Hedgepath, witnesses against him at his trial without their being named in the indictment as witnesses or appearing at the preliminary hearing where the question of probable cause was presented."

It is important, first, to state accurately the facts. Billy Hedgepath is the officer who found Pressley hiding behind the shower curtain in the Quarles apartment. Whether he testified at a preliminary hearing we are unable to say since there is nothing whatever in the transcript of the record concerning a preliminary hearing. The witnesses listed on the presentment include "Off. Billie Hedgepeth." The same name appears in the list of witnesses typed on the indictment. The witness who testified at the trial was Officer Billy Hedgepatch. We have no doubt Billie Hedgepeth, Billy Hedgepath and Billy Hedgepatch are one and the same person and we think any opinion to the contrary, in these circumstances, would be utterly frivolous. We have searched the transcript of the record very carefully but we have found no objection to Hedgepeth's testimony, no challenge directed to his competency to testify, no motion to

strike any of his testimony, no request for an instruction to disregard his testimony, no exception based on the trial judge's failure to include in her advisory instructions any comment relative to his testimony, nor is there any mention of his testimony in the motion for a new trial. The point appears to have been raised in this Court for the first time. While the transcript does not contain any pleadings dealing with discovery the testimony indicates Pressley did make a "motion for discovery" and that in reply thereto the State furnished a list of witnesses it intended to "produce in chief." There is no showing that Hedgepeth was not included in that list. Entirely apart from the obvious conclusion that this contention, as to Hedgepeth, is unfounded, the question was not presented to the trial court and, consequently, was not preserved for consideration by this Court. *Brooks v. State,* 235 Md. 23, 32, 200 A. 2d 177 (1964).

The situation in regard to Lucinda Gray is much the same. We quote from Pressley's brief:

> "It is further contended that at the time of trial the State's Attorney produced two witnesses, heretofore named [Lucinda Gray and Billy Hedgepath], and it was at this time he [Pressley] first learned of their existence as witnesses against him. * * * The transcript, although somewhat vague, appears to show that the Court granted the defendant an opportunity to examine at least Lucinda Gray before she was presented as a witness. The Appellant contends however, that the opportunity furnished him to interview the witnesses was insufficient for him to prepare a proper defense against their testimony. Appellant further contends that because of this denial, he was denied due process of law under the Fifth and Fourteenth Amendment of the United States Constitution. It is further contended by the Appellant that the State's Attorney deprived him of a fair trial by using these witnesses which surprised both he and his counsel."

Although the State seems not to have ordered a summons issued for Lucinda she was called, after the trial had begun, as a witness for the State. Before calling her, however, the Assistant State's Attorney addressed the court as follows:

"MR. COHEN: For the record, the State would like to amend its answer to discovery to include the names of witnesses of Doctor Simmons and Mrs. Gray of McCulloh Street. The State has notified the defendant prior to today about these witnesses, and we would like formally to amend the answer."

This elicited no comment from Pressley's counsel. Why it didn't seems clear enough. Counsel for Pressley, prior to the trial, filed an order directing the clerk to issue a summons for Lucinda. She was returned "summoned" and, of course, she was present in court. If counsel intended to use her as a witness for the defense (which they did) they certainly had ample opportunity to consult with her. That the State assumed all of the risks involved in calling her as a State's witness is hardly a ground for complaint. We find it difficult to believe Pressley is serious when he says "he first learned of * * * [Lucinda's] existence as a witness against him" when the State called her to the witness stand. If his counsel did not then know what her testimony would be, they certainly disregarded one of the basic rubrics of trial practice, namely, undertaking to use as a witness someone the nature of whose testimony has not been investigated thoroughly. Moreover, Pressley knew and if his attorneys were not told they should have discovered that Lucinda Gray was one of the two (or more) persons who saw the shooting. Finally what has been said concerning the absence of any objection to or motion to strike Hedgepeth's testimony applies fully and with equal force to Lucinda's testimony. Maryland Rule 885; *Brooks v. State, supra.*

We have been unable to find in the transcript anything which supports the statement in the brief that the trial judge "granted the defendant an opportunity to examine at least Lucinda Gray before she was presented as a witness." There was some objection to the production of Edwards as a rebuttal witness but Judge Jones, over the objection of the State, told counsel "if the defense needs any further time * * * [to interview Edwards] the court would grant it." There is no indication that Pressley took advantage of the offer—perhaps because he knew perfectly well what Edwards would say. In any event, there

is no contention before us which relates to Edwards or his testimony.

To repeat what Judge Markell said in *Madison v. State*, 200 Md. 1, 14, 87 A. 2d 593 (1952), "There was no error and no ruling. Defendant [seems to have] had a fair trial, and there is no reversible error."

*Judgment affirmed.*