## SAMUEL VENEY *v.* STATE OF MARYLAND
[No. 566, September Term, 1966.]

184

*Decided October 15, 1968.*

The cause was argued before HAMMOND, C.J., and MARBURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Daniel E. Klein, Jr.,* and *Wallace E. Hutton* for appellant.

*David T. Mason, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Robert S. Rothenhoefer, State's Attorney for Frederick County,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant was convicted of murder in the first degree by a

jury in Frederick County and sentenced to death. The victim was Sgt. Jack Cooper of the Baltimore City Police Department.

At approximately 9:40 P.M. on December 24, 1964, Luxie's Liquor Store at 2002 Greenmount Avenue in Baltimore City was robbed. Several men were involved. Appellant was identified as one of those men. Lt. Maskell of the Baltimore City Police Department arrived on the scene, accosted appellant, and was in the process of taking him into custody when one of the robbers shot Lt. Maskell. Lt. Maskell was shot a second time. Appellant was identified as firing the second shot. Lt. Maskell was not fatally wounded. The culprits escaped. Between 10:00 and 11:00 P.M. appellant and others alleged to have been involved were at the home of appellant's sister. Discussion of the incident took place. Appellant stated, "I think I shot him, too."

Sgt. Jack Cooper was one of those searching for the participants in the robbery and shooting of Lt. Maskell. Sgt. Cooper was seen at approximately 4:20 A.M. on December 25 by fellow officers. A few minutes later shots were heard from the direction in which Sgt. Cooper had gone. He was found fatally wounded near his police car, lying across an alley, face down, in an unconscious condition. The dome light of his car was on. The driver's door was open. The microphone of the radio was lying on the front seat.

The motor vehicle operator's license of appellant was picked up from the floor of the police car. Just outside the car on the driver's side under the open door were found the Social Security card, Selective Service card and birth certificate of appellant, together with a number of other papers connected with appellant.

Appellant was seen with a gun before and after the Cooper shooting. The girl friend of appellant's brother testified as follows with reference to a conversation between 7:00 and 8:00 A.M. on December 25:

> "Q. What did you hear Sam say? A. I believe I heard him say he had to shoot him.
> "Q. What were his words? A. That he had to shoot him. I never heard him say who or what.
> "Q. Did he say why? A. No, I heard him say something about an ID card.

186

"Q. An ID card? A. But I never seen him or he never said it in my presence that he had shot anybody. Neither one ever admitted it."

An admitted participant in the robbery testified as follows:

"Q. When you got to Eloise's house, who was there? A. Earl was there, Eloise was there, and Shirley and Margaret was with me when we got around there.

"Q. Now, did anyone else show up there after you got there? A. Sam came around later.

"Q. What happened? Describe what happened when Sam came in. A. He came in and rather than coming straight in he knocked on the door and we opened it and he said, everybody be quiet and pulled down the shades and he said he just shot a policeman.

"Q. Did he say why he had just shot a policeman? A. Yes.

"Q. What did he say? A. He said the police stopped him on his way around there and asked him for his identification and he showed it to him and when the police seen his last name was Veney he wanted to take him downtown and then he got to arguing with the police and he said the policeman hit him upside the head and that is when he shot him.

"Q. What did the police hit him with upside the head according to him? A. With a blackjack.

"Q. Blackjack? A. Yes.

"Q. And he shot him? A. That's right.

"Q. What happened then after you were all around there and you heard this news? A. Well, we tried to be quiet for a while and we were going to spend the night there and we would try to get out tomorrow and then he was talking about how he was going to get rid of the gun.

"Q. Who said this? A. Sam.

"Q. All right. What did he say about the gun? A.

> He said he had to get rid of it as soon as he could
> and he wanted to get rid of it. He didn't want to
> take the chance of walking the streets with it."

The "Eloise" to whom reference is above made was Eloise Bennett. The niece of Eloise Bennett found a gun about a week later. The gun was identified as the gun of appellant. The gun was further identified as the gun that had fatally wounded Sgt. Cooper and had wounded Lt. Maskell.

Earl Veney was in the company of Frances Mitchell at the time of the shooting of Sgt. Cooper.

### I.

Appellant claims he was denied due process of law when prospective jurymen who did not believe in capital punishment were excluded from service. He lists eleven prospective jurymen so excluded.

The questions propounded by the court to Paul Rice in the *voir dire* examination are typical of the questions propounded to the other prospective jurors so excluded.

They are:

> "(Court) (Paul Rice #35) Mr. Rice have you formed
> or expressed an opinion as to the guilt or innocence
> of Samuel Veney, the defendant in this case? A. No,
> I haven't.
> "Q. Do you have any conscientious scruples against
> capital punishment? A. Yes, I have.
> "Q. Do you feel that those scruples are such that you
> could not fairly and justly weigh the evidence in this
> case bearing in mind it is the Court's function and not
> the jury's to impose punishment in case the finding
> should be guilty? A. I am afraid so.
> "(Court) All right, the Court will excuse you."

Appellant cites *Witherspoon v. Illinois,* 391 U. S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968) in support of his position.

The Illinois jury, pursuant to the authority granted by Illinois law, imposed the death penalty. The jury has no such right in Maryland. Its authority under Code (1967 Repl. Vol.) Art. 27, § 413, is limited in rendering a verdict of murder in the first

degree to adding the words "without capital punishment," in which case the sentence of the court is required to be imprisonment for life. We take judicial notice of the fact that there have been many convictions in Maryland of murder in the first degree where the words "without capital punishment" have not been added by the jury and where the sentence has been to life imprisonment rather than death.

In *Witherspoon* Mr. Justice Stewart speaking for the Supreme Court said:

> "The issue before us is a narrow one. *It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt.* * * *" (emphasis supplied) 391 U. S. at 513.

In footnote 21 at page 522 to its opinion in *Witherspoon* the Supreme Court said:

> "We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case." (emphasis in original)

The same day the Supreme Court decided *Witherspoon* it decided the case of *Bumper v. North Carolina,* 391 U. S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968). In that case the defendant had been convicted of rape. The North Carolina statute

imposed a death penalty for such conviction, *unless* the jury recommended life imprisonment. The jury did recommend life imprisonment. It was contended that the constitutional right of Bumper to an impartial jury was violated when the prosecution was permitted to challenge for cause all prospective jurors who stated that they were opposed to capital punishment or had conscientious scruples against imposing the death penalty. Mr. Justice Stewart speaking for the Supreme Court said:

> "* * * Our decision in *Witherspoon* does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. * * * We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily 'prosecution prone', and the materials referred to in his brief are no more substantial than those brought to our attention in *Witherspoon*. Accordingly, we decline to reverse the judgment of conviction upon this basis." 391 U. S. at 545.

See also *State v. Mathis,* 52 N. J. 238, 245 A. 2d 20 (1968) where the Supreme Court of New Jersey had occasion to consider the application of *Witherspoon, supra,* and *Bumper, supra.* In New Jersey conviction of murder in the first degree carries with it the death sentence unless the jury recommends life imprisonment. The New Jersey Court affirmed the conviction. Mathis was sentenced to death.

The trial of appellant was prior to *Witherspoon* and prior to the enactment of Chapter 500 of the Acts of 1967 providing that no person shall be disqualified for service as a juror by reason of his beliefs against capital punishment.

It appears to us that the lower court in its questions on *voir dire* to those individuals who confessed having scruples against capital punishment made careful inquiry as to whether those

scruples were such that they could not fairly and justly weigh the evidence in the case. We believe it significant that, although not ultimately serving because of the right of peremptory challenge exercised by the State, there were five jurors accepted as qualified who stated that they did not believe in capital punishment. In each instance these jurors indicated that they could render a fair and impartial verdict notwithstanding their beliefs.

As heretofore indicated, the procedure used in this case was to first obtain a panel of jurors held to be qualified to serve. Upon the panel so established each side then exercised its peremptory challenges. This panel appears to have been fairly selected and to have represented a fair cross section of the community. The actions of the trial court in this case were in accordance with our decision in *Price v. State,* 159 Md. 491, 493, 151 A. 409 (1930).

## II.

Appellant contends he was denied a fair trial when the court refused to grant a change of venue from Frederick County. The crime took place in Baltimore City. The case was moved to Frederick County pursuant to the appellant's request for removal. Although appellant claims that the Criminal Court of Baltimore City merely indicated that appellant's case and certain companion cases would be removed to Frederick County and that the presiding judge in that county would then make a determination whether or not a removal was in order, it is to be noted that Chief Judge Foster in Baltimore in considering the first removal petition said:

> "As to your first motion, which is really a suggestion for removal filed by Samuel Veney, Indictment 5738, as I have already indicated I will sign an order removing that case from Baltimore City."

Moreover, it is to be noted that in the argument before the Circuit Court for Frederick County appellant's counsel said:

> "I understood the opposition to be we already had one removal and particularly in the murder case it is not a matter of right for a second removal."

The absolute right of removal can be exercised only once. *Lee v. State,* 164 Md. 550, 552, 165 A. 614 (1933), *cert. denied,* 290 U. S. 639 (1933).

Appellant complains of the extensive publicity given the trial of his brother, Earl Veney, on the robbery of Luxie's Liquor Store and the subsequent shooting of Lt. Maskell which trial took place in Frederick County beginning February 14, 1966, and ending February 16, 1966. Appellant's trial began April 11, 1966, and ended April 15, 1966. Sentence was not imposed in the Earl Veney case until a week after the conclusion of appellant's trial. Therefore, any prejudice would be from the Earl Veney trial and not from the Earl Veney sentence.

Frederick County is a county with a 1960 census population of 71,930 people. Appellant submitted newspaper clippings from "The Baltimore News-American", purportedly referring to appellant and his brother, Earl Veney. The following circulation figures were submitted:

Frederick Post—9000
Frederick News—7000
Baltimore Morning Sun—1064
Baltimore Evening Sun—506
Baltimore Sunday Sun—2702

No figures were submitted for The Baltimore News-American.

A large part of the clippings submitted from Baltimore newspapers were in the period between the commission of the crime on December 25, 1964, and October 6, 1965, when the case was moved to Frederick.

Appellant relies on the case of *Sheppard v. Maxwell,* 384 U. S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966). He does not complain that the jury was exposed to news coverage of facts regarding the issue to be tried, but claims news coverage of facts elicited from the previous trial of his brother, Earl Veney, were prejudicial. He relies on *Sheppard, supra,* to support this position. The facts, however, are clearly distinguishable. In *Sheppard, supra,* one of the issues was the fact that jurors had been exposed to information pertaining to the case they were trying through news accounts submitted by various branches of the news media. Mr. Justice Clark said for the Supreme Court:

"But the Court has also pointed out that '[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper.' *Bridges v. California, supra,* [314 U. S. 252 (1941)] at 271. And the Court has insisted that no one be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.' *Chambers v. Florida,* 309 U. S. 227, 236-237 (1940). 'Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.' *Pennekamp v. Florida,* 328 U. S. 331, 347 (1946). But it must not be allowed to divert the trial from the 'very purpose of a court system. . .to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.' *Cox v. Louisiana,* 379 U. S. 559, 583 (1965) (Black, J., dissenting). Among these 'legal procedures' is the requirement that the jury's verdict be based on evidence received in open court, not from outside sources. Thus, in *Marshall v. United States,* 360 U. S. 310 (1959), we set aside a federal conviction where the jurors were exposed 'through news accounts' to information that was not admitted at trial. We held that the prejudice from such material 'may indeed be greater' than when it is part of the prosecution's evidence 'for it is then not tempered by protective procedures.' At 313. At the same time, we did not consider dispositive the statement of each juror 'that he would not be influenced by the news articles, that he could decide the case only on the evidence of record, and that he felt no prejudice against petitioner as a result of the articles.' At 312. Likewise, in *Irvin v. Dowd,* 366 U. S. 717 (1961), even though each juror indicated that he could render an impartial verdict despite exposure to prejudicial newspaper articles, we set aside the conviction holding:

'With his life at stake, it is not requiring too

much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion. . . .'
At 728.

"The undeviating rule of this Court was expressed by Mr. Justice Holmes over a half a century ago in *Patterson v. Colorado,* 205 U. S. 454, 462 (1907) :

'The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'

"Moreover, 'the burden of showing essential unfairness . . . as a demonstrable reality,' *Adams v. United States ex rel. McCann,* 317 U. S. 269, 281 (1942), need not be undertaken when television has exposed the community 'repeatedly and in depth to the spectacle of [the accused] personally confessing in detail to the crimes with which he was later to be charged.' *Rideau v. State of Louisiana,* 373 U. S. 723, 726 (1963) .* * *" 384 U. S. at 350-352.

Appellant likewise relies on *Estes v. Texas,* 381 U. S. 532, 14 L. Ed. 2d 543, 85 S. Ct. 1628 (1965). That case is clearly distinguishable from the present case. In that case the pre-trial proceedings were covered live from the court room and parts of the trial were also filmed.

We regard *Seidman v. State,* 230 Md. 305, 187 A. 2d 109 (1962), *cert. denied,* 374 U. S. 807 (1963) as pertinent. Seidman was indicted for pandering and conspiracy with Fifer and others to violate the pandering laws of the State of Maryland. Fifer was convicted on a Friday. Seidman's trial commenced the following Monday. There was publicity with reference to Fifer's trial and of his connection with Seidman. It also was contended that during Fifer's trial there was an article which linked Fifer with a kidnap-murder ring and it was contended that the alleged connection of Fifer with Seidman tended to link Seidman to the same ring.

Chief Judge Brune there said for this Court:

"* * * [The trial Judge] was of the opinion that the
251 Md.—7

*voir dire* examination would satisfactorily determine whether any juror had been influenced by the news reports, and on *voir dire* he asked:

'And the fourth question is this: I'm going to preface it a little bit. The cases in which you may be selected as jurors are several of a series that were the result of an investigation by the Grand Jury. They did attract considerable attention in the press, on the radio and on television. It may be that you or some of you have read accounts of some of the matters or you may have seen or heard something about them as a result of the publicity, and my question to you is this: If you have read, heard or seen anything in connection with that series of investigations, do you have any opinion at this time as to the guilt or innocence of the accused George Seidman? If you do, please raise your hand and identify yourself. * * *'

"There was no response by any of the prospective jurors, and the court commented upon that fact. * * *

"* * * We find no abuse of discretion by the trial court in this case. Appellant did not meet his burden of persuasion with regard to his claim, for the prior cases in this State hold that the accused must make an affirmative showing that he has been prejudiced by the newspaper reports, and that the accused was not in a position to rely upon the *voir dire* examination for protection against a prejudiced juror. *Gray v. State,* 224 Md. 308, 167 A. 2d 865; *Basiliko v. State, supra; Grammer v. State,* 203 Md. 200, 100 A. 2d 257; *Wanzer v. State,* 202 Md. 601, 97 A. 2d 914; *Baltimore Radio Show, Inc. v. State,* 193 Md. 300, 67 A. 2d 497; and *Newton v. State,* 147 Md. 71, 127 A. 123.

"Here the trial court could properly find, as it did, that the articles which appeared prior to trial did not show prejudicial public reaction to the appellant (cf. *Piracci v. State, supra,* at 511), and he asked on *voir dire* whether any juror had formed an opinion of ap-

pellant's guilt or innocence as a result of news coverage of 'The Block'. This is not, therefore, a case in which appellant had no way to protect himself from jurors who may have been influenced by press coverage. Cf. *Basiliko v. State, supra,* where the articles appeared during the course of the trial when the protection of *voir dire* was not available.

"On the general subject of newspaper publicity and a fair trial in a criminal case, see also the remarks of Mr. Justice Holmes in *Holt v. United States,* 218 U. S. 245, 251 (in which newspaper articles appeared during the course of the trial and were apparently read by jurors who had been allowed to separate) : 'If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day.' " 230 Md. at 323-325.

In this case the trial court when examining jurors on their *voir dire* examined them individually and out of the hearing of other members of the panel. They were not examined *en masse* as was done in the *Seidman* case.

Precisely the same question was not asked by the trial court of each juror. Basically the same question was asked, however, and we believe the following propounded to prospective juror Robert Barrick, a resident of the City of Frederick for the preceding twenty years, is a fair example:

"Q. Have you formed an opinion relative to the guilt or innocence of the defendant concerning either the truth or falsity of any of the facts of this case from reading any newspapers, magazines or other periodicals or seeing or hearing television or radio broadcasts or from conversations or other sources? A. None whatsoever."

Barrick became foreman of the jury.

We take notice of the fact that Judge Clapp, one of the trial judges, is a resident of Frederick County. Judge Digges, in denying the motion for change of venue, said on behalf of Judges Digges and Clapp:

"Judge Clapp is much more familiar with the populace here than I am and based on our conversation and things that he is justified in taking judicial knowledge of, we think that there is every reason to believe that there can be a fair trial received at the hands of a jury that has shown no knowledge whatsoever other than the fact than (sic) there is a charge, and which they are going to learn immediately from the indictment itself in which he is being accused of the killing of a policeman, but with no knowledge of the details of the background of it, or if he has such slight knowledge that he would not be prejudiced."

It is noted that in this case at the request of counsel for the appellant the court did not follow the practice normally used in Frederick and many other counties in the absence of peremptory challenge of swearing each juror found to be qualified at the conclusion of examination on *voir dire* of such juror. Instead it went through the entire panel on *voir dire*. After challenges for cause were ruled upon there was submitted to appellant a panel upon which to exercise his peremptory challenges.

We are cognizant of the statement of the Supreme Court in *Sheppard, supra,* that it did not regard as dispositive, "the statement of each juror that he would not be influenced by the news articles, that he could decide the case only on the evidence of record, and that he felt no prejudice against [defendant] as a result of the articles." We believe, however, that in the relatively small county from which the jury was drawn and in which one of the trial judges lived, the trial court was entitled to consider, as it did, that judge's knowledge of local conduct, thoughts, reactions and publicity in deciding whether an unbiased jury could be drawn.

In this case there is no allegation that evidence which was to be introduced at trial or which pertained to the offense charged appeared in the newspapers, or was read by jurors prior to or during trial.

It is not to be presumed that an unbiased jury cannot be had. *Grammer v. State,* 203 Md. 200, 211, 100 A. 2d 257 (1953), *cert. denied,* 347 U. S. 938 (1954). The answers of the jurors

given under oath deny bias. Accordingly, considering all of the various factors involved, we find no abuse of the discretion of the trial court in this instance.

## III.

Appellant contends he suffered prejudice by the introduction of certain evidence which was later stricken.

Testimony was presented that three days before the robbery witness and two co-defendants in the robbery case, Taylor and Earl Veney, went to a gun shop in Baltimore County. Taylor purchased one gun and Earl Veney bought a shot gun and two other guns. The witness signed the gun purchase order because Earl Veney did not have his wallet or any identification with him. The evidence was later stricken.

The State next produced an employee of the gun shop. It attempted through her to introduce into evidence a gun purchase order for the purpose of showing that Earl Veney had purchased a .32 cal. Browning automatic. The announced purpose was to show that one of the bullets taken out of Lt. Maskell for which the gun was never recovered was fired from this type gun and that this particular gun was not the murder weapon.

The evidence with reference to the gun purchase was stricken.

The assistant medical examiner who performed the autopsy on Sgt. Cooper testified that an examination of the coat and shirt submitted to him with the body of the deceased corroborated his findings as to the number of bullet wounds and that the bullet holes in the coat matched those in the body. The evidence was stricken.

In each instance the court directed the jury to disregard the evidence.

The erroneous admission of evidence ordinarily is not deemed prejudicial where it is subsequently stricken, or where the trial judge at the time the evidence was given instructed the jury to disregard it. See *Lusby v. State,* 217 Md. 191, 195, 141 A. 2d 893 (1958) ; *Heyward v. State,* 161 Md. 685, 690, 158 A. 897 (1932). 7 M.L.E. *Criminal Law,* § 783.

See also *Pennsylvania Co. v. Roy,* 102 U. S. 451, 458-459 (1880) where the statement is made :

"Notwithstanding this emphatic direction that the jury should exclude from consideration any evidence in relation to the pecuniary condition of the plaintiff, the contention of the defendant is, that the original error was not thereby cured, and that we should assume that the jury, disregarding the court's peremptory instructions, made the poverty of the plaintiff an element in the assessment of damages; * * *. To this position we cannot assent * * *. The charge from the court that the jury should not consider evidence which had been improperly admitted, was equivalent to striking it out of the case. The exception of its admission fell when the error was subsequently corrected by instructions too clear and positive to be misunderstood by the jury. The presumption should not be indulged that the jury were too ignorant to comprehend, or were too unmindful of their duty to respect, instructions as to matters peculiarly within the province of the court to determine. It should rather be, so far as this court is concerned, that the jury were influenced in their verdict only by legal evidence. *Any other rule would make it necessary in every trial, where an error in the admission of proof is committed, of which error the court becomes aware before the final submission of the case to the jury, to suspend the trial, discharge the jury, and commence anew.* A rule of practice leading to such results cannot meet with approval." (emphasis supplied)

In this instance the instruction to the jury to disregard the evidence was completely adequate. The evidence in this case was not of such character as to cause a departure from the general rule. As is hereinafter pointed out, there was ample evidence before the court to go to the jury. The evidence of the coat and shirt would have been cumulative, at the most. The gun evidence was for the purpose of elimination and did not pertain to Samuel Veney. We see no prejudice to appellant.

## IV.

Appellant claims error by reason of the introduction of the

evidence of the earlier robbery and the shooting of Lt. Maskell. He contends that the evidence of these matters was presented under the felony murder rule, that the State abandoned the felony murder theory at the end of the State's case and that the appellant is prejudiced by the State's introduction of this evidence. This evidence was the subject of a lengthy argument at the conclusion of the State's case. The trial court denied the motion to strike this evidence. It stated that this evidence went to establish motive.

In *Wood v. State,* 191 Md. 658, 62 A. 2d 576 (1948) there was a robbery of a cab driver at approximately 3:15 A.M. Wood objected to the admissibility of the robbery evidence when he was tried for murder of a police officer who hailed him at approximately 3:50 A.M. Judge (later Chief Judge) Henderson speaking for this Court said:

> "* * * [W]e think it is clear that the evidence relating to the Prough robbery, within three-quarters of an hour prior to the fatal shooting, was properly admitted. Wood's prior conduct was directly and inseparably related to the killing, and bore upon his motive and intent. As was said in *Suhay v. United States,* 10 Cir., 95 F. 2d 890, 894: 'The evidence relating to the offenses committed in New York [bank robberies] was material upon the question of motive for the homicide. It tended to show that the appellants killed the deceased with deliberation, premeditation, and malice aforethought for the purpose of avoiding arrest for return to that state for prosecution.' * * *" 191 Md. at 665.

In *Suhay, supra,* there was a bank robbery in New York on March 12, 1937. Suhay and his companion killed an FBI agent more than a month later, on April 16, 1937, in Topeka, Kansas, when the FBI agent tried to apprehend them for the bank robbery.

In *Brown v. State,* 220 Md. 29, 150 A. 2d 895 (1959) Brown was accused of murder of a police officer who had arrested him for uttering a forged check. Brown said he thought he had

been picked up for forgery. Judge (now Chief Judge) Hammond speaking for this Court said:

> "* * * As we said in *Ward v. State,* 219 Md. 559, the question is always one of relevance and, under ordinary circumstances, evidence that an accused has done other acts which constitute a crime has no relevance towards showing that he is guilty of the crime for which he is being tried. On the other hand, if 'the evidence of another offense has a natural tendency to establish, or offers a reasonable presumption or inference as to a principal fact at issue or matter in dispute, is should be admitted even though it discloses other offenses.' One of the instances in which evidence has a natural tendency to establish or to permit an inference as to a principal fact at issue is where it tends to show motive or intent. *Purviance v. State,* 185 Md. 189, 196; *King v. State,* 190 Md. 361, 372. *It is not infrequently held that where a killing occurs in an attempt to avoid arrest or to escape after having been arrested, evidence that the accused recently had committed one or more crimes is admissible as showing the reason for the killing. Wood v. State,* 191 Md. 658, 663-665; *Perrera v. State,* 184 Md. 51, 56; *Bryant v. State, supra,* 207 Md. 565, 586; 1 Underhill, *Criminal Evidence,* (5th Ed.), Sec. 209; 1 Wharton, *Criminal Evidence,* (12th Ed.), Sec. 237, p. 524; *State v. Walters* (Ore.), 209 P. 349; *Suhay v. United States,* 95 F. 2d 890 (10th Cir.); *State v. Simborski* (Conn.), 182 A. 221; *Herde v. State* (Wis.), 295 N. W. 684; *People v. Metheson* (Ill.), 26 N. E. 2d 465." (emphasis supplied) 220 Md. at 36-37.

The evidence of the robbery and subsequent shooting of Lt. Maskell was relevant as having a natural tendency to establish or to permit an inference as to a principal fact at issue, tending to show motive or intent. Accordingly, there was no error in its admissibility.

### V.

The appellant attacks the sufficiency of the evidence to sustain conviction of the crime of murder in the first degree.

The case having been tried before a jury, the Court of Appeals does not weigh the evidence presented to the jury, but only determines its sufficiency to take a particular issue, or the entire case, to the jury. *Ramsey v. State,* 239 Md. 561, 566-567, 212 A. 2d 319 (1965). To set aside the jury's verdict we must be able to say there was no legally sufficient evidence from which the jury could find him guilty beyond a reasonable doubt. *Pressley v. State,* 244 Md. 664, 667, 224 A. 2d 866 (1966).

Appellant points out there were no eye witnesses to the shooting. Circumstantial evidence is sufficient to sustain a conviction in this State, *Davis v. State,* 236 Md. 389, 399, 204 A. 2d 76 (1964), *cert., denied,* 380 U. S. 966 (1965); *Brown v. State,* 222 Md. 290, 296, 159 A. 2d 844 (1960); *Breeding v. State,* 220 Md. 193, 198, 151 A. 2d 743 (1959).

In *Breeding, supra,* defendant testified he was too drunk to know what he was doing from sometime Saturday evening until he woke up Sunday morning. He denied ever having seen the victim. He was convicted entirely through circumstantial evidence.

It is true that the appellant's brother, Earl Veney, took the stand to testify that he was in possession of appellant's wallet and that at about 2:30 A.M. on December 25 he threw the wallet in an alley when he saw a police car with a flashing light because he knew the wallet had the name "Veney" in it and that the police were looking for the Veneys. The jury also had before it, however, the testimony of two witnesses as to appellant's statement about shooting an officer, the evidence of appellant's identification found at victim's police car, and evidence that the murder weapon was found in the very home in which testimony showed that appellant said he had to get rid of his gun. The credibility of this evidence was for the jury.

In *Chisley v. State,* 202 Md. 87, 107, 95 A. 2d 577 (1953) we said that to establish premeditation, "* * * 'Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is.' " We further said, "It is generally established

and certainly is necessarily the law of Maryland, where the jury is the judge of the law and the facts, that where there is evidence to go to the jury, whether or not there was malice, wilfullness, deliberation and premeditation must be for the jury to determine. * * *"

There was ample evidence before the jury from which it could conclude that appellant wilfully, deliberately and with premeditation shot and killed Sgt. Cooper to avoid apprehension.

We find no error.

*Judgment affirmed.*