507 A.2d 1072

**Marselle Jerome BOWERS**

v.

**STATE of Maryland.**

**No. 122, Sept. Term, 1984.**

Court of Appeals of Maryland.

May 7, 1986.

122

Victoria S. Keating and George E. Burns, Jr., Asst. Public Defenders (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

SMITH, Judge.

Marselle Jerome Bowers was convicted by a Charles County jury of murder in the first degree and sentenced to death. In *Bowers v. State*, 298 Md. 115, 468 A.2d 101 (1983), we affirmed the conviction but vacated the death sentence because the jury failed to find a mitigating factor which the State at trial had conceded the evidence showed. Accordingly, we remanded the case for a new sentencing proceeding.

A Charles County jury has again sentenced Bowers to death. The case reaches us pursuant to the provisions of Maryland Code (1957, 1982 Repl.Vol.) Art. 27, § 414 stating that whenever the death penalty is imposed we shall review the sentence. We shall affirm.

The facts are set forth in our earlier opinion. We shall relate only such facts here as are necessary to an understanding of the issues presented. We consider the issues seriatim.

## 1. Leg-irons

Over the objection of counsel, Bowers was in leg-irons during the trial. The issue of leg-irons was discussed in chambers. The trial judge, the same one who presided at the earlier trial, said in ruling upon the issue:

"This matter was discussed in chambers and we are talking about the concern of defense counsel that Mr. Bowers is in leg-cuffs, which I suppose some would describe them as leg-irons, and someone else would describe them as leg-cuffs.

"I have received from the Sheriff's Office a memorandum concerning this, and what they are saying is that due to the serious nature of the charges, and Mr. Bowers' prior background, and specifically as it relates to this case he is considered by them an escape risk. They have instructed the court security personnel that they are to properly protect the Defendant and courtroom attendants, and they indicate that they feel that leg-cuffs should be required at all times, and that two officers be with the

Defendant during transportation and inside the court-room.

"I just point out that the Sheriff's Office is charged with courtroom security, and it is indicated by the counsel representing Mr. Bowers that he has been cooperative and in no way committed any act which would indicate that he presents a security risk.

"However, I am aware having been involved in the prior trial that there was some difficulty that occurred when he was incarcerated in Somerset County which resulted in his being transferred to the Department of Corrections, and that after he was confined at the Department of Corrections some difficulty occurred at that institution. This was while he was awaiting trial for the offense for which he has been convicted.

"I conclude that there is some basis for the concern of the Sheriff's Office, and even though maybe given the same set of facts and circumstances I might reach a different conclusion, nevertheless these individuals are charged with courtroom security, and I am not saying I would have made a different decision on the issue, but I am just saying it may be that given all the facts and circumstances I might have made a different decision.

"Nevertheless, I don't feel that I ought to second guess the individuals charged with security where there has been some prior indication of difficulty involving the Defendant.

"I also point out that if something does occur which would cause some action to be taken during the course of the hearing I think that would be much more prejudicial to Mr. Bowers than what has taken place in the beginning.

"I conclude, based on everything that has been presented to me, that the Sheriff's Office is not being unreasonable or arbitrary in their decision in this instance, and for that reason I feel that I should not countermand their direction to the court security people. So that motion is denied."

The memorandum to which the trial judge referred was to court security personnel relative to this trial from the individual in the Sheriff's Department who commanded the "Court/Civil Division." It read:

"Cpl. E.K. Thompson has been temporarily assigned to Court Security Section for duration of Bowers' trial.

"Due to serious nature of charges against Bowers and his prior background, he is to be considered an escape risk, and, you are directed to take steps to properly protect the Defendant and courtroom attendants. This may include leg cuffs at all times; two officers with Defendant during transportation and inside Courtroom; and any other means you may deem necessary."

The trial judge in his sentencing report listed the prior record of Bowers, beginning with a juvenile conviction in 1966 on an assault and battery charge with a knife. It came down to 1976. There were no crimes of violence listed as that term is defined in Code (1957, 1982 Repl.Vol.) Art. 27, § 413(g)(1). (The trial judge, of course, would have been aware, as we stated in *Bowers*, 298 Md. at 140, 468 A.2d at 114, that as an outgrowth of the incident now before the Court Bowers was convicted of kidnapping in the Circuit Court for Talbot County on April 7, 1982. This is defined as a crime of violence. That case was removed from Worcester County to Talbot County for trial. Bowers was sentenced to a term of thirty years from August 4, 1981.) Under institutional history the following was reported:

"Institutional History

| | | |
|---|---|---|
| 9/26/75 | Interfering with Fire Drill | 24 hour lock-up |
| 12/10/75 | Refused to obey orders Creating Disturbance | |
| 1/9/76 | Creating Disturbance Disrespectful to Officer Loud and Abusive Language | 15 days loss of privileges |
| 5/27/76 | Assault on two prison guards | (see prior record) |

"Mr. Bowers has been considered a 'management problem' throughout his institutional career. During his confinement in connection with the instant case, he has been involved in one disturbance in the jail which involved several other prisoners and required the assistance of the Town Police Department and the Maryland State Police to bring under control. He has also battered a fellow inmate and a jail employee. As a result of these acts, Mr. Bowers was transferred from the Somerset County jail to the custody of the Commissioner of Corrections and placed in segregation (solitary confinement)."

The trial judge further reported relative to "Other Significant Data About Defendant":

"It is significant that a report by his former probation officer, dated September 15, 1981, states that Mr. Bowers was a problem throughout his probation. The report described him as 'an extremely sophisticated, street-wise individual who is also a very clever manipulator.'

"He has also displayed continuing dissatisfaction with all attorneys assigned to represent him in the instant case. He has refused to cooperate with counsel, has discharged counsel, and has filed voluminous pleadings *pro se,* with his attorney as 'stand-by'.[1] His maneuverings caused the trial to be delayed several times."

At Bowers' request the jury was asked on voir dire whether "there [was] anyone on the panel who because [Bowers was in leg-cuffs] could not render a fair and impartial verdict based on the evidence presented at the hearing." There was no positive response. Bowers personally later requested that inquiry be made as to whether

---

1. The issues which we shall consider under "7" in this opinion are ones raised by Bowers' pro se petitions filed subsequent to oral argument which we elect to treat as supplemental briefs.

"from [his] appearance in the leg-shackles, if any of the jurors would draw any inferences as to [his] character." Inquiry was made with the judge's specifying:

"We are referring to his reputation for being truthful, as well as his character as to peace and good order other than the matter for which he has been convicted."

Only one juror said he would draw such inferences. He was excused.

Bowers calls attention to the language of the Court in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970):

"Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." 397 U.S. at 344, 90 S.Ct. at 1061, 25 L.Ed.2d at 359.

*Allen* must be placed in the context that the case concerned a disruptive defendant and the Court's comment involved gagging in addition to shackling. Here we have only shackles. Among other things, the defendant had told the trial judge, after a warning:

" 'There's not going to be no trial, either. I'm going to sit here and you're going to talk and you can bring your shackles out and straight jacket and put them on me and tape my mouth, but it will do no good because there's not going to be no trial.' " 397 U.S. at 340, 90 S.Ct. at 1059, 25 L.Ed.2d at 357.

In that case Allen was removed from the courtroom. According to the Court, "the Court of Appeals concluded that a trial judge could never expel a defendant from his own trial and that the judge's ultimate remedy when faced with an obstreperous defendant like Allen who determines to make his trial impossible is to bind and gag him." 397 U.S. at 342, 90 S.Ct. at 1060, 25 L.Ed.2d at 358. Immediately before that which has been quoted by Bowers the Court said:

"The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." 397 U.S. at 343–44, 90 S.Ct. at 1061, 25 L.Ed.2d at 359.

The Court concluded:

"We do not hold that removing this defendant from his own trial was the only way the Illinois judge could have constitutionally solved the problem he had. We do hold, however, that there is nothing whatever in this record to show that the judge did not act completely within his discretion. Deplorable as it is to remove a man from his own trial, even for a short time, we hold that the judge did not commit legal error in doing what he did." 397 U.S. at 347, 90 S.Ct. at 1062–63, 25 L.Ed.2d at 361.

On the issue at hand see Annot. 90 A.L.R.3d 17 (1979).[2] III American Bar Association, *Standards for Criminal Justice* (2d ed. 1982) § 15–3.1(c) states:

"Defendants and witnesses should not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order. If the trial judge orders such restraint, the judge should enter into the record of the case the reasons therefor. Whenever physical restraint of a defendant or witness occurs in the presence of jurors trying the case, the judge should instruct those jurors that such restraint is not to be considered in assessing the proof and determining guilt."

The commentary pertaining to this standard states in relevant part:

"As stated, the Supreme Court did not rule out physical restraint. Nor, however, did the Court provide any guidelines for when such restraint might be used. Under prior state case law, the test for special restraint is whether it is 'reasonably necessary to maintain order,' which is the language used in many cases. It emphasizes that restraint should be limited to that necessary to prevent anticipated harm. There is some authority that shackles are not to be used if the danger can be overcome by armed guards and that handcuffs are not to be used if less visible leg irons will suffice. The harm to be prevented is disorder from a variety of causes, and includes such risks as escape, interruption of proceedings, attack upon the defendant or witness by others, attack upon others by the defendant or witness, and self-destruction.

---

**2.** This case, insofar as we can determine, represents our first exposure to an issue such as is in the case at bar. We observe that in *Jones v. State,* 11 Md.App. 686, 276 A.2d 666 (1971), the Court of Special Appeals was concerned with the shackling and gagging of a disruptive defendant. *Dixon v. State,* 27 Md.App. 443, 450–52, 340 A.2d 396, 401, *cert. denied,* 276 Md. 741 (1975), and *Dunphy v. State,* 13 Md.App. 671, 675–77, 284 A.2d 631, 634–35 (1971), were cases where jurors had seen defendants shackled in the process of their being brought to court.

"It is most important that there be a record of the trial judge's action that affords a sound basis for appellate review. Further, the standard adopts the view that if a trial judge allows physical restraints to be used, the judge must state for the record the basis of the decision, and the record must support the trial judge's conclusions, either by way of the individual's conduct during trial or by way of evidence adduced out of the presence of the jury on the question of physical restraint. The hearing, although informal, makes it possible for the alleged facts justifying restraint to be made a matter of record and to be challenged by the party aggrieved." *Id.* at 15–81 to –83.

The rules governing the imposition of physical restraint upon criminal defendants are said to be rooted in the English common law. For instance, *People v. Duran,* 16 Cal.3d 282, 127 Cal.Rptr. 618, 545 P.2d 1322 (1976), states:

"The rules governing the imposition of physical restraints upon criminal defendants find their origin in the English common law. Thus Blackstone wrote, '... though under an indictment of the highest nature, [the prisoner] must be brought to the bar without irons or any manner of shackles or bonds, unless there be evident danger of an escape, and then he may be secured with irons.' (4 Blackstone's Commentaries 322; see also 2 Hale, Pleas of the Crown 219, which reiterates Blackstone's observation and adds, '[b]ut *note,* at this day [prisoners] usually come with their shackles upon their legs, for fear of an escape, but stand at bar unbound, till they receive judgment'; 2 Bishop, New Commentaries on the Law of Pleading and Evidence and the Practice in Criminal Cases (2d ed. 1913) 955, which states that the prisoner should be unshackled in the courtroom so as to have ' "use of his reason, and all advantages, to clear his innocence" ' Krauskopf, *Physical Restraint of the Defendant in the Courtroom* (1971) 15 St. Louis U.L.J. 351.)" 16 Cal.3d at 288, 127 Cal.Rptr. at 621–22, 545 P.2d at 1325–26. (Emphasis in original.)

To similar effect see *Martin v. State,* 51 Ala.App. 405, 409, 286 So.2d 80, 84 (1973); *State v. Roberts,* 86 N.J.Super. 159, 162, 206 A.2d 200, 202 (1965).

Although factually both dissimilar and distinguishable from the case at bar, the parties both quote from *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). That case involved a defendant who, on the morning of his trial, asked a jail officer for his civilian clothes to wear at trial. No action was taken and he was obliged to stand trial in jail attire. The Court concluded its opinion by saying:

"[A]lthough the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." 425 U.S. at 512–13, 96 S.Ct. at 1697, 48 L.Ed.2d at 135.

The Court opened its discussion of the issue before it by stating:

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Drope v. Missouri,* 420 U.S. 162, 172 [95 S.Ct. 896, 904, 43 L.Ed.2d 103] (1975). The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. Long ago this Court stated:

'The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.' *Coffin v. United States,* 156 U.S. 432, 453 [15 S.Ct. 394, 402, 39 L.Ed. 481] (1895).

"To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the princi-

ple that guilt is to be established by probative evidence and beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364 [90 S.Ct. 1068, 1072, 25 L.Ed.2d 368] (1970)." 425 U.S. at 503, 96 S.Ct. at 1692–93, 48 L.Ed.2d at 130. Other courts, when considering issues similar to that in the case at bar, have discussed the presumption of innocence. *See, e.g., Collins v. State,* 164 Ga.App. 482, 484, 297 S.E.2d 503, 505 (1982); *State v. Tolley,* 290 N.C. 349, 366, 226 S.E.2d 353, 367 (1976). It is important to bear in mind that, unlike this case, in all but one of the cases which we have encountered discussing restraint, the issue has arisen in the context of a determination of guilt or innocence. In this case there is no presumption of innocence because Bowers was convicted at the earlier trial and we affirmed on appeal. He stands in the position of a convicted felon brought before a trial court for sentencing. He thus is unlike the ordinary defendant who at trial stands clothed with a presumption of innocence.

The courts uniformly rely upon an abuse of discretion standard for reviewing the action of trial judges in the matter of restraints, a standard noted in that portion of *Allen* which we have already quoted. *See, e.g., Billups v. Garrison,* 718 F.2d 665, 667 (4th Cir.1983), *cert. denied,* 469 U.S. ——, 105 S.Ct. 91, 83 L.Ed.2d 37 (1984); *Woodard v. Perrin,* 692 F.2d 220, 222 (1st Cir.1982); *Kennedy v. Cardwell,* 487 F.2d 101, 107, 110 (6th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States v. Samuel,* 431 F.2d 610, 615, 433 F.2d 663 (4th Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971); *Loux v. United States,* 389 F.2d 911, 919 (9th Cir.1968), *cert. denied,* 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135, and 393 U.S. 869, 89 S.Ct. 156, 21 L.Ed.2d 138 (1968); *Odell v. Hudspeth,* 189 F.2d 300, 302 (10th Cir.1951), *cert. denied,* 342 U.S. 873, 72 S.Ct. 116, 96 L.Ed. 656 (1951); *Martin v. State,* 51 Ala.App. 405, 409, 286 So.2d 80, 84 (1973); *State v. Harding,* 137 Ariz. 278, 288, 670 P.2d 383, 393 (1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984); *People v. Duran,* 16 Cal.3d 282, 291,

127 Cal.Rptr. 618, 624, 545 P.2d 1322, 1328 (1976); *Elledge v. State,* 408 So.2d 1021, 1023 (Fla.1981), *cert. denied,* 459 U.S. 981, 103 S.Ct. 316, 74 L.Ed.2d 293 (1982); *Collins,* 164 Ga.App. at 485, 297 S.E.2d at 506; *State v. Moen,* 94 Idaho 477, 480, 491 P.2d 858, 861 (1971); *State v. Daniel,* 297 So.2d 417, 418 (La.1974); *State v. Stewart,* 276 N.W.2d 51, 61 (Minn.1979), quoting *State v. Coursolle,* 255 Minn. 384, 389, 97 N.W.2d 472, 476 (1959); *Commonwealth v. Brown,* 364 Mass. 471, 476, 305 N.E.2d 830, 834 (1973); *Roberts,* 86 N.J.Super. at 164, 206 A.2d at 203; *People v. Mendola,* 2 N.Y.2d 270, 276, 159 N.Y.S.2d 473, 477, 140 N.E.2d 353, 356 (1957); *State v. Billups,* 301 N.C. 607, 611, 272 S.E.2d 842, 846 (1981); *State v. Moore,* 45 Or.App. 837, 839–40, 609 P.2d 866, 867 (1980); *Freeman v. State,* 556 S.W.2d 287, 306 (Tex.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978); *State v. Simmons,* 26 Wash.App. 917, 920, 614 P.2d 1316, 1317–18 (1980).

On the issue of discretion Judge Winter explained for the Fourth Circuit in *Samuel,* 431 F.2d 610:

"It is [the trial judge] who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes. *E.g., Gregory v. United States,* 365 F.2d 203 (8 Cir.1966); *Guffey v. United States,* 310 F.2d 753 (10 Cir.1962). As a discretionary matter, the district judge's decision with regard to measure[s] for security is subject to limited review to determine if it was abused. We stress that the discretion is that of the district judge. He may not, as is suggested at one part in the record before us, delegate that discretion to the Marshal. Of course, he should consult with the Marshal when other than ordinary security such as the general presence of guards in the courtroom is contemplated, and he may rely heavily on the Marshal's advice as to what may be required since it is the Marshal who has the experience in the keeping of prisoners and who must provide the

guards and bear the major responsibility if untoward incidents occur.

"Unless the district judge's discretion is to be absolute and beyond review, the reasons for its exercise so as to require special security measures, must be disclosed in order that a reviewing court may determine if there was an abuse of discretion. *Cf. United States v. Broyles*, 423 F.2d 1299 (4 Cir.1970)." 431 F.2d at 615.

Further explanation is found in *Moen*, 94 Idaho 477, 491 P.2d 858:

"Although the sheriff has some initial responsibility for determining whether an accused should be handcuffed during a jury trial, the trial judge must, in fulfilling his duty to preside over the trial, decide the question for himself. *People v. Mendola*, 2 N.Y.2d 270, 159 N.Y.S.2d 473, 140 N.E.2d 353 (1957); *State v. McKay*, 63 Nev. 118, 165 P.2d 389 (1946), rehearing denied, 63 Nev. 118, 167 P.2d 476 (1946). In exercising his discretion, the judge need not rely only upon evidence formally offered and admitted at trial. His knowledge may properly stem from official records or what law enforcement officers have told him. *State v. McKay, supra.* In addition, the trial court may take judicial notice of facts generally known within the limits of its jurisdiction. *State v. McKay, supra; Makley v. State*, 49 Ohio App. 359, 197 N.E. 339 (1934). However, the information relied upon should be shown on the record before trial and out of the presence of the jury, and the defendant should be afforded reasonable opportunity to meet that information." 94 Idaho at 479–80, 491 P.2d at 860–61.

Some courts, such as was the case in *Woodard*, 692 F.2d at 222, have seen as important the fact that the trial judge "polled the jurors to determine whether any of them would be prejudiced by the fact that the defendant was under restraints." Other courts have referred to the fact that a cautionary instruction was given by the trial judge. *See, e.g., Billups*, 718 F.2d at 668; *Brown*, 364 Mass. at 477, 305 N.E.2d at 834.

Many of the courts which have considered the matter have stated that in order to adopt security measures it is not necessary that the trial judge's decision be based upon activity at the time of trial. *See, e.g., Kennedy,* 487 F.2d at 111; *Loux,* 389 F.2d at 919–20; *Martin,* 51 Ala.App. at 410, 286 So.2d at 84–85; *Stewart,* 276 N.W.2d at 62; *Simmons,* 26 Wash.App. at 921, 614 P.2d at 1318. As the court put it in *Stewart,* a "trial judge need not wait for some event to occur in the courtroom before imposing restraints."

Leg-cuffs, shackling, or other restraints have been upheld in, among others, *Billups,* 718 F.2d at 669; *Woodard,* 692 F.2d at 222; *Kennedy,* 487 F.2d at 111–12; *United States v. Samuel,* 433 F.2d 663, 664 (4th Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971); *United States v. Thompson,* 432 F.2d 997, 998 (4th Cir.1970), *cert. denied,* 401 U.S. 944, 91 S.Ct. 955, 28 L.Ed.2d 226 (1971); *Loux,* 389 F.2d at 920; *Martin,* 51 Ala.App. at 410, 286 So.2d at 85; *Harding,* 137 Ariz. at 288, 670 P.2d at 393; *Elledge,* 408 So.2d at 1023 (Fla.); *Collins,* 164 Ga.App. at 485, 297 S.E.2d at 506; *Moen,* 94 Idaho at 481, 491 P.2d at 862; *Daniel,* 297 So.2d at 418 (La.); *Brown,* 364 Mass. at 477, 305 N.E.2d at 835; *Stewart,* 276 N.W.2d at 63 (Minn.); *Mendola,* 2 N.Y.2d at 276, 159 N.Y.S.2d at 477, 140 N.E.2d at 356; *State v. Woodard,* 121 N.H. 970, 974, 437 A.2d 273, 275 (1981); *Billups,* 301 N.C. at 614, 272 S.E.2d at 848; *Moore,* 45 Or.App. at 840, 609 P.2d at 867; *Freeman,* 556 S.W.2d at 306 (Tex.); *Simmons,* 26 Wash.App. at 920, 614 P.2d at 1317–18.

Illustrative of an application of discretion is the opinion of the Fourth Circuit in *Billups,* 718 F.2d 665:

"Nor are we persuaded by appellant's argument that the record, when viewed as a whole, fails to justify his shackling. The record, as amplified by the discovery conducted in the habeas proceeding, reveals that the Sheriff's Department, which normally provides courtroom security in North Carolina, was, as trial judge Bruce found, shorthanded the week of the trial; that the additional uniformed, armed officers, who were either in the

courtroom or adjacent to it in the courthouse, were assigned duties other than guarding Billups; that the courtroom design made it an unsecure area; and that Billups posed more than an average escape risk. Finally, the record reveals that the jurors observed Billups in shackles at most one time, that Judge Bruce issued appropriate cautionary instructions to ensure that Billups would not be prejudiced by that fact, and that steps were taken to ensure that during trial the jurors would not see Billups in shackles." 718 F.2d at 668–69.

*Tolley,* 290 N.C. 349, 226 S.E.2d 353, is also instructive: "[I]n addition to the uncontroverted fact of defendant's prior escape attempt, the court, in making its decision, also had before it the facts that defendant was a twenty-five-year-old male, in apparent good health and physical condition, who was charged with two rapes, and that the sheriff, charged with the custody of defendant during the trial, was of the opinion that shackles were necessary. Furthermore, although it is possible, as defendant suggests, that any necessary security precautions might have been accomplished by the use of armed guards rather than shackles, the record reflects that defense counsel at no time suggested any such alternative measures. In fact, the need for shackles as opposed to some less restrictive means of security was not controverted." 290 N.C. at 370, 226 S.E.2d at 369.

*Elledge,* 408 So.2d 1021 (Fla.), is the only case we encountered where the shackling to which objection was made was at a sentencing proceeding. In that case the original death sentence had been vacated by the Supreme Court of Florida and the case remanded for sentencing as in the case at bar. The Supreme Court of Florida said:

"Appellant asserts that his appearance before the sentencing jury in leg irons led to prejudice in the jury's mind. Cases which concern such prejudice deal with the adverse effects that such restraints have upon the accused's presumption of innocence. *See Kennedy v. Cardwell,* 487 F.2d 101, 104 (6th Cir.1973), *cert. denied,* 416

U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). But appellant did not stand before the sentencing jury as an innocent man; rather he stood as a confessed murderer of three persons. The critical issue in a restraint case is the degree of prejudice caused by the restraints. Here, we can find very little prejudice since the appellant was an avowed dangerous individual. *See United States ex rel. Stahl v. Henderson,* 472 F.2d 556, 557 (5th Cir.), *cert. denied,* 411 U.S. 971, [93 S.Ct. 2166] 36 L.Ed.2d 694 (1973). Second such restraints are within the sound discretion of the court, and the record indicates the judge had information that the appellant had threatened to attack his bailiff. Elledge through his confessed acts had proven himself a man of his word when violence was threatened, so we would be hard pressed to find the trial court abused its discretion in taking such precautions." 408 So.2d at 1022–23.

This case is unlike *Roberts,* 86 N.J.Super. 159, 206 A.2d 200. There the trial judge indicated that because the sheriff had asked for shackling he "had to do it." One of the cases relied upon by Bowers is *Commonwealth v. DeVasto,* 7 Mass.App.Ct. 363, 387 N.E.2d 1169 (1979). The trial judge there was found to have placed "inordinate consideration on two newspaper accounts of the alleged incident. . . . There [was] no indication that the judge sought the recommendation of any official charged with the custody of the prisoner as to what security measures might be necessary. . . . The record show[ed] no inquiry by the judge into the crucial issue whether any risk existed that the defendant might attempt to escape during trial." 7 Mass.App.Ct. at 366, 387 N.E.2d at 1172. Numerous other cases are cited by one side or the other but we find them generally inapplicable.

We do not regard the fact that no shackling took place at the first trial as controlling, notwithstanding that some of the conduct upon which the trial judge relied in making his decision took place prior to that trial. No request was made for shackling at that trial. At the time of that trial there had been no decision by this Court upholding the

conviction of murder. What we have here is a case of mature reflection based upon somewhat different conditions prompting a different view of what might be necessary.

Code (1957) Art. 87, § 45, unchanged since its enactment by Ch. 62, § 5 of the Acts of 1801, provides, "The sheriff shall safely keep all persons committed to his custody by lawful authority until such persons are discharged by due course of law." The sheriff was vested with responsibility here. In the course of the discharge of his responsibilities his office made a decision for recommendation to the trial judge.

The trial judge had before him an individual whose convictions for first degree murder and kidnapping had each been affirmed on appeal. He did not appear garbed with a presumption of innocence but as a convicted felon awaiting sentence. As the judge's sentencing report makes clear, he was aware of previous institutional difficulty with Bowers and of problems in Bowers' personality as reflected by the judge's own observations at trial and that which was said by the probation officer.

■ Although we would prefer the bases for the judge's conclusions to have been somewhat more explicitly stated, we believe it plain that the trial judge exercised his discretion in determining that leg irons should be on Bowers during the time of trial and he was not influenced solely by the recommendation of the sheriff. We find no abuse of discretion.

■ We see yet another reason for an affirmance on this issue and that is that prejudice has not been shown. In cases such as *Veney v. State,* 251 Md. 182, 190–97, 246 A.2d 568, 573–76 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969), and *Seidman v. State,* 230 Md. 305, 323–25, 187 A.2d 109, 120–21 (1962), *cert. denied,* 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031 (1963), we have found voir dire adequate to screen out any prejudice caused by pretrial publicity in the area from which the jury was drawn. If adequate for that, it certainly should be ade-

quate for selection of a jury untainted with prejudice because of a defendant's shackling. Only one juror indicated that shackling would influence him and that juror was excused.

## 2. Principal in the first degree

This contention is sparked by a note the jury sent during the course of its deliberations in which it asked the trial judge to define a principal in the first degree. At the outset of the jury instructions he had told the jury:

"The paper you have is Findings and Sentencing Determination.

"The matter before you is whether the defendant should receive a life or death sentence.

"The first question to be answered is whether the defendant was a principal in the first degree to the murder that has been found to have been committed in this case.

"To find that the defendant is a principal in the first degree to that murder you must find that he alone, or with the assistance of others, committed the act or acts which resulted in the victim's death.

"Now, in order to prove that the defendant was a principal in the first degree it is not enough to show that he may have aided or assisted or even encouraged the actual killer or that he may have driven the car or acted as a look out or that he may have been a principal in the first degree to some other crime that may have been committed during this occurrence.

"In order for you to even consider the death penalty you must unanimously find beyond a reasonable doubt that this defendant actually committed the act or acts which resulted in the victim's death in this case, one Monica McNamara.

"And the first question, therefore, that must be answered, is this.

"Do you find that the defendant, Marselle Jerome Bowers, was a principal in the first degree to the first degree murder of Monica McNamara?

"If your answer to that question is yes, you then proceed to answer the remaining questions contained in this paper."

The jury instruction requested by Bowers stated in relevant part:

"You are further instructed that before you can even consider the death penalty in this case, you must determine whether or not the defendant, Marselle Bowers is a principal in the first degree in the murder of the victim. That means that each and every one of you must unanimously agree beyond a reasonable doubt that Mr. Bowers actually strangled the victim with his own hands."

When the jury's question was presented defense counsel argued:

"All we are asking that the Court instruct that they must find that he by his own hand physically was involved in killing her.

"Not just that he was present there. I think that is where the confusion lies."

The trial judge gave an instruction similar to that which he had given originally. Due exception was taken to that instruction.

Both parties rely upon *Pope v. State*, 284 Md. 309, 396 A.2d 1054 (1979), in which Judge Orth said for the Court:

"A principal in the first degree is the one who actually commits a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent. A principal in the second degree is one who is actually or constructively present when a felony is committed, and who aids or abets in its commission. *See Camphor v. State*, 233 Md. 203, 205, 196 A.2d 75 (1963); *Thorton v. State*, 232 Md. 542, 544, 194 A.2d 617 (1963); *Veney v. State*, 225 Md. 237, 238, 170 A.2d 171 (1961); *Agresti v. State*, 2 Md.App. 278, 280, 234 A.2d 284 (1967); 4 W.

Blackstone, Commentaries *34; Clark & Marshall, A Treatise on the Law of Crimes §§ 8.01–8.02 (7th ed. 1967); L. Hochheimer, Crimes and Criminal Procedure §§ 31–32 (1st ed. 1897); R. Perkins, Criminal Law 656 and 658 (2d ed. 1969).[13]" 284 Md. at 326, 396 A.2d at 1064–65.[3] *Accord State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041, 1046 (1978).

Bowers argues that R. Perkins and R. Boyce, *Criminal Law,* 736 (3d ed. 1982), states that "a principal in the second degree is one who did not commit the crime with his own hands . . . ." That must be placed in context. What the text says is:

"1.   PRINCIPAL IN THE FIRST DEGREE
  *"The distinction between principals in the first and second degrees is a distinction without a difference except in those rare instances in which some unusual statute has provided a different penalty for*

---

**3.**  In footnote 13, at the end of that which we have just quoted, the Court said:

> "[13.] We have observed: 'In Maryland, as in many other states, there is little practical difference between a principal in the first and second degree,' and we characterized such difference as 'a shadowy distinction.' *Vincent v. State,* 220 Md. 232, 239, n. 1, 151 A.2d 898 (1959). Clark & Marshall, A Treatise on the Law of Crimes (7th ed. 1967) elaborated the point:
>   'The common law recognizes no difference in the punishment between principals in the first and second degree, but regards them as equally guilty, and subject to the same punishment. In practice the distinction is immaterial and on an indictment charging one as principal in the first degree, he may be convicted on evidence showing that he was present aiding and abetting, and conversely.
>   'And at common law a principal in the second degree may be indicted and convicted before trial of the principal in the first degree, and even after he has been acquitted, or convicted of an offense of lesser degree, though the commission of the act by the principal in the first degree must be proved in order to convict one as aiding and abetting.' *Id.* at § 8.05, p. 521.
> *See* Hochheimer §§ 37–38. And 'unless it is plain from the nature of an offense made a felony by statute, that the provisions of the statute were intended to affect only the party actually committing the offense, aiders and abettors are punishable." Clark & Marshall at § 8.04, p. 520." 284 Md. at 326, 396 A.2d at 1065.

*one of these than for the other. A principal in the first degree is the immediate perpetrator of the crime while a principal in the second degree is one who did not commit the crime with his own hands but was present and abetting the principal. It may be added, in the words of Mr. Justice Miller, that one may perpetrate a crime, not only with his own hands, but 'through the agency of mechanical or chemical means, as by instruments, poison or powder, or by an animal, child, or other innocent agent' acting under his direction.*

"There may be joint principals in the first degree, as where two or more cause the death of another by beating, stabbing, shooting or other means, in which both, or all, participate. If, however, one holds a victim while a second inflicts a fatal injury with a knife, only the stabber is a principal in the first degree, because the stabbing caused the death and the holding was merely aiding, thus rendering the holder guilty as a principal in the second degree." *Id.* at 736. (Emphasis in original.)

For similar statements Bowers relies upon M. Foster, *Crown Cases* 347 (1762), Clark and Marshall, *Law of Crimes* § 8.01 (7th ed. 1967), and I *Wharton's Criminal Law and Procedure* § 106 (Anderson ed. 1957). Wharton states:

"In all crimes, whether treason, felonies, or misdemeanors, a distinction is made between principals in the first and second degree.

"The principal in the first degree actually commits the crime, either by his own hand or by the hand of an innocent agent. His presence at the scene of the place of the crime is not essential, as the principal in the first degree may start a chain of events which cause the harm in his absence. Thus, a person though absent is guilty as a principal in the first degree when he leaves poison for his victim, or sends an innocent agent, an insane person, or a child too young to have criminal capacity, to commit the crime.

"It is frequently stated that the principal in the first degree must be either physically or constructively present at the scene of the crime. This is not a useful criterion, for the principal in the first degree need not be actually present, and in order to determine when his absence will be regarded as constructive presence it is necessary to resort to the definition first stated of whether the absent principal in fact committed the crime by his own hand or that of an innocent agent." *Id.* at 230–32.

We have often said what Judge Digges observed for the Court in *State v. Foster*, 263 Md. 388, 283 A.2d 411 (1971), *cert. denied*, 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972):

"It is a well established rule that when objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole. *Alston v. Forsythe* (and cases cited therein) 226 Md. 121, 135, 172 A.2d 474 (1961); *Christ v. Wempe*, 219 Md. 627, 639, 150 A.2d 918 (1959); *Reindollar v. Kaiser*, 195 Md. 314, 319–20, 73 A.2d 493 (1950); *Shotkosky v. State*, 8 Md. App. 492, 508, 261 A.2d 171 (1970); *Graef v. State*, 1 Md.App. 161, 171, 228 A.2d 480 (1967)." 263 Md. at 397, 283 A.2d at 415.

To like effect see *Thomas v. State*, 301 Md. 294, 315, 483 A.2d 6, 17 (1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *Mack v. State*, 300 Md. 583, 598, 479 A.2d 1344, 1351 (1984); *Poole v. State*, 295 Md. 167, 186, 453 A.2d 1218, 1228 (1983); and *Clayborne v. Mueller*, 266 Md. 30, 40–41, 291 A.2d 443, 448 (1972).

■ We do not know whether the strangulation of the victim here was manual or ligature. Instances of ligature strangulation are known. *See, e.g., Johnson v. State*, 303 Md. 487, 495 A.2d 1 (1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). A principal in the first degree clearly would include an individual responsible for a ligature strangulation. The instruction prayed by Bowers

does not make absolutely clear that it includes a ligature strangulation. Viewing the instruction given by the trial court as a whole, we find no error.

### 3. Non-statutory mitigating factors

Bowers requested the trial court to instruct the jury:

"In addition to the mitigating circumstances that the legislature has given you—that is not an all-inclusive list. You must under the law consider any other factors or circumstances which you set forth in writing as mitigating circumstances in this case, any other factors and circumstances which you consider to be mitigating circumstances in this case.

"The defendant has asked you to consider such things as that he is willing to spend the rest of his life in prison; that he has good prospect for a productive life in prison; his personal background; that he was in the service served overseas; the impact on his 11 year old daughter; that he completed his GED while in the service; and any other circumstances which you list in writing which in your judgment constitute mitigating circumstances in this case. So again, anything that you find to be mitigating circumstances, if you find that they have been proven by a preponderance of the evidence, you would check that item on the list."

Bowers proposed a verdict sheet which would have read:

"Other mitigating circumstances exist, as are set forth below:

"8. Supportive family and strong religious background.

    yes    no

"9. Military service.

    yes    no

"10. Negative impact of service and divorce.

    yes    no

"11. Drug and alcohol use.

    yes    no

"12. Anguish to family.

    yes    no

"13.  Prospect for a productive life in prison.  
$\overline{\hspace{3em}}$  $\overline{\hspace{3em}}$  
yes  no

"14.  Marselle Bowers' remorse. .  
$\overline{\hspace{3em}}$  $\overline{\hspace{3em}}$  
yes  no"

It is to be specifically noted that on Bowers' version of the verdict sheet there would have been no provision for the jury's finding any additional mitigating factor or factors.

The trial judge said he had "prepared the sheet and the rule says it shall be in the form as set out in the rule." He said after further argument:

"THE COURT: Fortunately or unfortunately they determine how much weight they are supposed to receive, not the Court, not you.

"You argue as to their importance but they consider whether they are factors that ought to be considered.

"I mean you are saying to me I am asking you to put in this verdict sheet factors that they must consider in determining whether there are mitigating circumstances and that is not what the statute requires and that is not what the rule says.

"The rule says any other mitigating circumstances they feel has some bearing on the sentence they consider and list them in that report.

"Too, I think that they may disagree with you. They may say well, we don't think this is a mitigating circumstance.

"You are saying to them and you are asking me to instruct them that this is a mitigating circumstance, which you ought to consider, and you either find it yes or no, to exist.

"And the way the statute is and the way the rule is, it is a mitigating circumstance that they must find is in fact a mitigating circumstance. We don't give that to them and say this is a mitigating circumstance and you either find it does exist or it does not.

"That isn't the purpose of that provision in the statute.

"They determine whether it is a mitigating, if it does exist, it is a mitigating circumstance."

He instructed the jury as to the verdict sheet:

"Then, in Section II, you are to consider the seven specific mitigating circumstances that are listed and there is provision under No. 8 which allows you to set forth any other mitigating circumstances which you find to exist and which you conclude are relevant to your consideration as to what sentence ought to be imposed in this case.

"I am going to give you a definition of mitigating circumstances so that you can do as the law contemplates.

"Consider any other mitigating circumstances which you find to exist which mitigating circumstances are in addition to those specifically enumerated in Section II which deals with mitigating circumstances. The definition that I will give you is that contained in Black's Law Dictionary, which is pretty uniformly accepted as the standard in the legal field. The definition in Black's Legal Dictionary is as follows:

" 'Mitigating Circumstances: Such as do not constitute a justification or excuse but which in fairness and mercy may be considered as extenuating or reducing the degree of punishment.'

"You see from that definition that a mitigating circumstance does not have to constitute a justification or an excuse for the commission of the act, but it is a circumstance which in fairness and mercy you may consider as reducing the degree of punishment in the case.

"Also, I point out to you that it is necessary that the State prove the aggravating circumstances listed in Section I and the defendant must prove the mitigating circumstances as set forth in Section II."

Bowers contends that the trial judge erred in refusing to consider his proposed mitigating circumstances.[4]  He relies upon *State v. Johnson*, 298 N.C. 47, 257 S.E.2d 597 (1979). There the court said:

"If, however, a defendant makes a timely request for a listing in writing of possible mitigating circumstances, supported by the evidence, and if these circumstances are such that the jury could reasonably deem them to have mitigating value, we are of the opinion that the trial judge must put such circumstances on the written list.

"The legislature did not intend to give those mitigating circumstances expressly mentioned in the statute primacy over others which might be included in the 'any other circumstance' provision.  Such an intent, if it existed, might run afoul of *Lockett v. Ohio, supra*, 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973].  In *Lockett* Ohio's death penalty statute was found unconstitutional under the Eighth and Fourteenth Amendments because the Ohio sentencing authority could consider only three mitigating factors and none other.  The Supreme Court concluded, *id.* at 604–05, 608: [98 S.Ct. at 2964–65]

'that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death .... The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in non-capital cases.... The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individ-

---

**4.**  Counsel for Bowers argued to the jury what counsel believed to be mitigating circumstances not listed on the trial court form.  The jury found as mitigating circumstances two of the points so argued, his military service in Germany and the impact of his divorce.

ualized consideration as a constitutional requirement in imposing the death sentence.

'There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

. . . .

'To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors.' (Emphasis original.)

A footnote to the quoted sections of *Lockett* provides, 'Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record or the circumstances of his offense.' *Id.* at 604 n. 12. [98 S.Ct. at 2965 n. 12]

"Under *Lockett* a legislature would be free to provide that the existence of certain mitigating factors would preclude the imposition of the death penalty, while the existence of others should simply be considered, but not as controlling, on the question. A death penalty sentencing statute, however, which by its terms or the manner in which it is applied, puts some mitigating circumstances in writing and leaves others to the jury's recollection might be constitutionally impermissible under the reasoning of *Lockett.* For if the sentencing authority cannot be precluded from considering any relevant mitigating circumstance supported by the evidence neither should such circumstances be submitted to it in a manner which

makes some seemingly less worthy of consideration than others.

"Thus we are satisfied that our legislature intended that all mitigating circumstances, both those expressly mentioned in the statute and others which might be submitted under G.S. 15A–2000(f)(9), be on equal footing before the jury. If those which are expressly mentioned are submitted in writing, as we believe they should be, then any other relevant circumstance proffered by the defendant as having mitigating value which is supported by the evidence and which the jury may reasonably deem to have mitigating value must, upon defendant's timely request, also be submitted in writing.

"Since, however, defendant made no specific request to include possible 'other mitigating circumstances' on the written verdict form submitted to the jury and, likewise, made no timely request to include defendant's good character as a mitigating circumstance, we find no error in the actions of the trial judge in failing to do these things." 298 N.C. at 72–74, 257 S.E.2d at 616–17. (Footnotes omitted.)

We do not believe that *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), quoted by the North Carolina court, requires the decision sought by Bowers. *Johnson* was decided the following year after *Lockett*. We have found no other decision reaching a similar conclusion.

Code (1957, 1982 Repl.Vol.) Art. 27, § 413 is concerned with sentencing procedure if a person is found guilty of murder in the first degree. It specifies before whom the proceeding is to be conducted; the evidence admissible; what are to be considered as aggravating factors; definitions of terms used; the procedure to be followed if no aggravating circumstances are found to exist; mitigating circumstances that may be considered including, in addition to those listed, "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case," etc. Subsection (*l* ) states:

"The Court of Appeals may adopt rules of procedure to govern the conduct of a sentencing proceeding conducted pursuant to this section, including any forms to be used by the court or jury in making its written findings and determinations of sentence."

Maryland Rule 4–343(e) was adopted pursuant to that authority in addition to the general authority with which we are vested under the Constitution.

Rule 4–343(e) says, "The findings and determinations [by the sentencing authority] shall be made in writing in the following form," and then goes on to set forth the form. The last part of Section II of the form is:

"8. Other facts specifically set forth below constitute mitigating circumstances:

                                       yes   no

. . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . .
(Use reverse side if necessary)"

That proposed by Bowers would not have been as set forth in Rule 4–343(e).

■ The General Assembly has determined that certain facts if proven constitute mitigating circumstances. Then, in response to *Lockett*, provision has been made for the sentencing authority to list any other facts proven by a preponderance of the evidence which in the authority's judgment constitute a mitigating factor. To instruct the jury as Bowers requested would be a determination by the court that the facts listed by Bowers if found by the jury by a preponderance of the evidence were entitled to be considered mitigating circumstances. We do not believe that the statute, the form, or *Lockett* contemplate such. The intention is, as we see it, simply that the jury may itself set forth any facts not listed on the submitted form which it believes constitute a mitigating factor. We find no error.

### 4. The question of parole

The jury during the course of its deliberations sent a series of questions to the trial judge. The first one was: "Life Imprisonment how many years until parole." The trial judge responded: "This question cannot be answered and your decision must be made based on the factors contained in the paper entitled Findings & Sentence Determination."

At trial counsel for Bowers asked the court "that the jury be instructed that for the purposes of their determination a life sentence, sentence to life imprisonment means a sentence to life imprisonment and they are to follow that." To us it is argued that it is not improper to inform the jury, at the request of the defendant, that in the event of a life sentence the defendant will not be eligible for parole until he has served a certain number of years; that the defendant "is not under the same restrictions as the State regarding the type of information that he may wish the jury to consider, for while the State in proving aggravating circumstances is limited to a showing that one or more of the aggravating circumstances specifically listed under Art. 27, sec. 413(d) exists, ... the defendant may prove *any* mitigating circumstances." (Emphasis by Bowers.) He further argues, "Additionally, although the possibility that a defendant will be paroled is clearly not a relevant concern if the question is, should the defendant therefore be executed, *Poole* [*v. State*, 295 Md. 167, 453 A.2d 1218 (1983)], it does seem that the fact that the defendant will *not* be paroled until a certain number of years has passed *is* a relevant concern if the question is, should the defendant therefore not be executed." (Emphasis in original.)

Code (1957, 1982 Repl.Vol.) Art. 27, § 413(c)(1) states:

"(1) The following type of evidence is admissible in this proceeding:

"(i) Evidence relating to any mitigating circumstance listed in subsection (g);

"(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of which the State has notified the defendant pursuant to § 412(b);

"(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

"(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

"(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

In *Poole v. State,* 295 Md. 167, 453 A.2d 1218 (1983), the Court was faced with the prosecution's inflamatory arguments to the jury pertaining to parole. Judge Couch said for the Court:

"In our view, reference to the possibility of future parole was improper and, upon remand, should not again be made. We have previously addressed the issue of the propriety of the prosecutor commenting on the possibility of parole and clearly held that such comments are improper. *See Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962). In *Shoemaker,* Chief Judge Brune stated:

'The statements with regard to parole in the context in which they were made here, we think, exceeded the limits of permissible comment by the prosecutor. This Court has never had occasion, as far as we are informed, to consider the question whether remarks relating to possible parole, or similar remarks, constituted reversible error. Of course, each case depends a good deal on its own facts, even where the remarks may fall into the same general classification. References by a prosecutor to the right of appeal, the possibility of executive clemency and parole of a defendant have, however, been considered by many other courts. Although there are decisions each way, we think that the

better reasoning and the weight of authority are against the propriety of such arguments. One reason in support of what we think is the better rule is that arguments should be based upon the evidence, but the principal objection to arguments of this type goes even deeper and is exemplified, we think in the present case.

'The chief vice of the reference in this case to the possibility of parole is that it suggested to the jury that it might in part shift its responsibility for a finding of the defendant's guilt to some other body.' *Id.* at 468–69, 180 A.2d at 685 (numerous citations omitted).

In the instant case, we believe this type of argument is likely to allow the jury to disregard its duty to determine aggravating and mitigating factors, and to then balance one against the other as required by Code (1957, 1982 Repl.Vol.), Article 27, § 413, before imposing the death penalty. Any consideration of the possibility of parole as such simply is irrelevant and obviously prejudicial; we cannot condone such argument." 295 Md. at 196–97, 453 A.2d at 1233.

■ Evidence as to the length of time an individual might have to serve under a life sentence before becoming eligible for parole would not, in our view, be "of probative value and relevant to sentence . . . ." Under the statute such evidence thus would not be admissible. The responsibility of the jury is to weigh the aggravating and mitigating factors and to determine whether the sentence should be death or life imprisonment. The actual length of time one might have to serve under a life sentence is no more relevant to that determination than the means which the State would use to impose the death penalty or whether there might be court proceedings subsequent to the determination of sentence by way of appeal, post conviction or federal habeas corpus.

5. Application of Art. 41, § 122(b)(1)

At the time the offense in the case at bar was committed Code (1957, 1978 Repl.Vol.) Art. 41, § 122(b) provided that a

person sentenced to life imprisonment was "not [to be] eligible for parole consideration until he ha[d] served 15 years or the equal of 15 years when considering the allowance for diminution of period of confinement provided for in Article 27, § 700 and Article 27, § 638C ...." The General Assembly amended this section by Ch. 298 of the Acts of 1983, effective July 1, 1983, providing that such a person should not be eligible until he had served twenty-five years. The Attorney General advised the Governor relative to the statute "that the new 25 year minimum will apply only to inmates sentenced to life imprisonment for *crimes occurring on or after July 1, 1983.* Any other application would violate the *ex post facto* clauses of the United States Constitution ...." (Emphasis his.)

Bowers asserts that under *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) "an accused may make an intelligent and knowing waiver of fundamental constitutional protections." Thus, he says he may waive the ex post facto protection here. He contends that his willingness to serve twenty-five years before consideration for parole is a mitigating factor which the jury might take into consideration. We do not see it that way at all.

What Bowers attempts to do is to bargain with the sentencing authority. That authority would not have the ultimate right to determine whether or when Bowers should be paroled. We do not believe this is permitted under our death sentence statute.

### 6. The autopsy report

Code (1982) § 5–311(d), Health-General Article provides:

"(d) *Evidence.*—(1) In this subsection, 'record':

"(i) Means the result of a view or examination of or an autopsy on a body; and

"(ii) Does not include a statement of a witness or other individual.

"(2) A record of the office of the Chief Medical Examiner or any deputy medical examiner, if made by the medical examiner or by anyone under the medical examin-

er's direct supervision or control, or a certified transcript of that record, is competent evidence in any court in this State of the matters and facts contained in it."

At the sentencing proceeding the State moved to introduce the "full autopsy report and photos that are attached thereto." The defense objected on the grounds that certain portions were missing. Counsel stated, "Subsequent to the first hearing Mr. Bowers ... wrote to the Medical Examiner's Office, and in response to his request they sent him a copy of this, which is the complete autopsy." It was noted, for instance, that the exhibit presented to the court had only six photographs while what was sent to Bowers had thirteen.[5] It was claimed the certification was inaccurate. The trial judge said:

"This is the official report according to this that has been sent to the State's Attorney, and which is admissible under the statute. The statute doesn't provide that the entire records of that Office are admissible, it says the report which is submitted by that Office is admissible, and that is what we have which is certified in accordance with the statute.

    *     *     *     *     *     *

"This conforms with the statute. The objection is overruled."

We pointed out in *Bowers*, 298 Md. at 137, 468 A.2d at 112, in discussing Bowers' contention that an autopsy report unaccompanied by the testimony of the medical examiner who prepared it violated his constitutional right to confront witnesses against him, "Bowers admitted that she was strangled." We deem the autopsy report properly admissible under the statute. Even if it were not, however,

---

5. We observe that here Bowers seems to have wanted, among other things, more pictures from the post-mortem report but in *Bowers v. State*, 298 Md. 115, 135–36, 468 A.2d 101, 111–12 (1983), he was objecting to the admission of any photos as a part of the post-mortem report.

in the light of Bowers' admission this would be harmless error. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

### 7. Bowers' supplemental briefs

#### a

Bowers has submitted what he has entitled "Petition for Alternative Writ of Mandate, Prohibition, Mandamus or Certiorari and Supporting Authorities." This was submitted in proper person after oral argument. We choose to treat it as a supplemental brief.

Bowers quotes Code (1957, 1982 Repl.Vol.) Art. 27, § 413(d)(10) listing as an aggravating factor, "The defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree." He points out, "The evidence in the instant case was of a circumstantial nature, based primarily upon a statement allegedly given by the Petitioner, Respondents proffer no eyewitness accounts of the crime into evidence." He then says that the State has "ignored the mandatory and specific language" of Art. 27, § 413(d)(10), stating "that the wording of the statute *alone,* takes or places his criminal case beyond its perimeters." (Emphasis his.) He asserts that under the evidence "[t]he murder *was not* committed 'while' 'committing or attempting to commit' any crime listed in the language of the statute," that "[t]here *is* a distinct separation between the 'murder' and *any* inference of the commission on [sic] *any* crimes listed in the statute," that none of the crimes listed are continuing crimes. (Emphasis his.) Thus, he asserts that the statute is not ambiguous and that it indicates "in order to sentence a criminal defendant to death, the State is obligated to show (by evidence) that the murder and crimes relied upon from the statute are to be merged ('... murder while committing or attempting to commit ....') otherwise the sentence under the laws of Maryland would be life imprisonment."

We observe first of all that in *Bowers,* 298 Md. at 152–56, 468 A.2d at 120–22, we rejected an argument that the trial

judge erred in not excluding from the jury's consideration rape or first degree sexual offense as an aggravating factor based on a claim that there was insufficient evidence. We said:

"Given the evidence as to a woman's screams, the victim's forcible abduction, the presence of semen, the erythema, the manner of death, and Bowers' own statement, there clearly was sufficient evidence for a rational trier of fact to determine beyond a reasonable doubt that Bowers was guilty of rape or of first degree sexual offense as to this victim." 298 Md. at 156, 468 A.2d at 122.

■■ Bowers' contention that the aggravating circumstance is inapplicable because he did not murder the victim while in the act of raping her appears to be unique in this State. A similar contention has been considered, however, in Georgia, whose statute is similar. In *Romine v. State,* 251 Ga. 208, 305 S.E.2d 93 (1983), the defendant first murdered his mother. Then after what was believed to be the passage of two or more hours he murdered his father. The court said:

"[A]ppellant contends that since the two murders in this case were not simultaneous, one was not committed while the offender was engaged in the commission of the other. We do not agree that § (b)(2) requires simultaneity of action with regard to the two offenses. *Gilreath v. State,* supra; *Peek v. State,* 239 Ga. 422, 431, (238 S.E.2d 12) (1977). As in *Peek,* the murders in this case 'were committed by appellant in a relatively short period of time in what can be fairly viewed as one continuous course of criminal conduct. Thus, under the facts of this case, the jury was authorized in finding that the first murder was committed in the course of the second murder.' Ibid." 251 Ga. at 214, 305 S.E.2d at 99.

To similar effect see *Roberts v. State,* 252 Ga. 227, 314 S.E.2d 83, *cert. denied,* 469 U.S. ——, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984); *Gilreath v. State,* 247 Ga. 814, 837, 279 S.E.2d 650, 670 (1981), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982); *Peek v. State,* 239 Ga. 422, 431,

238 S.E.2d 12, 19 (1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 218, 58 L.Ed.2d 194 (1978). We deem this contention to be without merit.

b

Bowers has submitted what he has entitled "Motion for Reconsideration and Stay of Issuance of Mandate or in the Alternative a Motion for Limited Remand on Issues." This, too, was submitted in proper person after oral argument. We likewise choose to treat it as a supplemental brief.

Bowers points out:

"At *every* stage of proceedings in the instant case, the Appellee has used an alledged [sic] free and voluntary statement of the Appellant, which clearly raises a legal foundation for the Defense and Jury Question (Issue) of 'Intoxication.' " (Emphasis in original.)

He then goes on to state:

"Through inadvertance [sic] of Counsel(s) representing Appellant at all phases of litigation, no defenses were presented, no requests for instructions were made relative to this pertinent issue, The Court (below) did not instruct on the issue of intoxication and no Appeal was advanced on the issue."

He further observes that "intoxication is both a mitigating factor and an element which could render negation of 'premeditation' an essential element in First Degree Murder, all germane to the Jury in their deliberations of the 'Law and facts.' " He contends:

"Because no requests were given for such an instruction and no instruction were in fact given on this important issue, the Jury did not and could not properly decide 'the laws and facts' of the instant case and The Appellee (State) was relieved of its burden of proof by the instructions."

As Bowers concedes, the point was not raised and decided below. Hence, under Rule 885 the point is not preserved for our review. The only other circumstance in

which we could review the matter is under the provisions of Rule 4–325(e) (formerly Rule 757h) providing, that an appellate court may, in its discretion, "take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." Our cases make plain, however, that ordinarily we will not take up allegations of "plain error" if, as Judge Horney put it for the Court in *Reynolds v. State,* 219 Md. 319, 324–25, 149 A.2d 774, 777 (1959), "the errors complained of are such that the trial court could have—and undoubtedly would have—corrected if the defendant had interposed h[is] objections, as []he should have done, before the jury retired to consider its verdict." We decline to take cognizance of the alleged error here, particularly where even Bowers is so uncertain as to whether there was error as to suggest that we "remand the case pursuant to Rule 871 for an evidentiary hearing to determine if a Genuine Jury Issue/Question exists and if it is found to exist, should a New Trial be Granted."

### 8. Proportionality review

Bowers was born November 4, 1951. The incident in question took place on or about July 8, 1981. Thus, he was just under 30 years of age at that time. In *Bowers,* 298 Md. 115, 468 A.2d 101, we said:

"The autopsy report established that sperm was present in the victim's vagina and anus at the time of her death. Moreover, the report showed evidence of anal lacerations and localized erythema. It conclusively established that she was strangled to death." 298 Md. at 156, 468 A.2d at 122.

The jury found as an aggravating factor that "[t]he defendant committed the murder while committing or attempting to commit robbery, rape in the first degree, or sexual offense in the first degree." As mitigating factors the jury found that Bowers had not previously been found guilty of a crime of violence, had not entered a plea of guilty or nolo contendere to a charge of a crime of violence

and had not been granted probation on stay of entry of judgment pursuant to a charge of a crime of violence; that the act of Bowers was not the sole proximate cause of the victim's death, and, under "8," "[o]ther facts specifically set forth" which "constitute mitigating circumstances," namely, "impact of service in Germany" and "impact of Divorce." As indicated, the jury's sentence was death.

In the process of our review in this case we have considered each of the reports submitted by trial judges under Rule 4–343. We have selected eight which we deem to be "similar" within the contemplation of Art. 27, § 414(e)(4).

*Julius Bailey.* Bailey was 28 years old at the time of his offense. He kidnapped a Catholic University graduate student while she was walking toward her car on a parking lot in Washington, D.C. Her body was later discovered in an isolated wooded area in Prince George's County. She had been raped and shot twice in the head with a .38 calibre handgun. Her snow-covered car, without tags, was discovered several weeks later in a shopping center parking lot. The jury found as aggravating circumstances that the victim was taken or attempted to be taken in the course of a kidnapping or abduction or attempt to kidnap or abduct and that the murder was committed while committing or attempting to commit robbery, arson, rape, or sexual offense in the first degree. None of the established mitigating circumstances were found. Under "other facts," however, the jury listed:

"(1) Family and friends will miss him.

"(2) Past family history.

"(3) Work attitude (was willing to work).

"(4) His is a human life.

"(5) He was convicted on circumstantial evidence *alone.*" (Emphasis in original.)

The jury sentenced to life imprisonment. In fact, the sentencing form said the jury "determine[d] the sentence to be life plus 100 years with *no* parole." (Emphasis the jury's.)

Obviously, the attempted sentence was not sanctioned by statute.

*Kirk Noble Bloodsworth.* Bloodsworth was 23 years of age at the time of his offense. He was convicted by a jury of first degree murder, first degree rape, and first degree sexual offense. He lured a 9-year-old girl into a wooded area where he raped, sodomized, inserted a tree branch into her vagina, and murdered her. The cause of death was severe trauma to the head and strangulation. A large rock or concrete mass was used to cause the head injury. He elected to have the sentencing proceeding conducted before the judge who presided at his trial. The court found as an aggravating factor that the murder was committed while committing or attempting to commit robbery, arson, rape in the first degree, or sexual offense in the first degree. As mitigating factors the judge found that Bloodsworth had not previously been convicted of a crime of violence and, under "other facts," he had no history of violence or other deviant behavior. The sentence was death.

*Elvis Horton.* Horton was 36 years of age at the time of his offense. He was convicted of the rape and murder of a 12-year-old girl in Baltimore City. The Medical Examiner gave the cause of death as strangulation by hands or a broad ligature of some kind. Contributing to the death were blunt force injuries on the right side of the victim's head which could have caused death in and of itself, according to the Medical Examiner. The victim was found in the basement of a rowhouse where Horton lived as a baby sitter for the two children (12 and 9) of his sister-in-law. A jury deadlocked on sentencing so a life sentence was imposed as required by Art. 27, § 413(k)(2).

*John Kevin Johnson.* Johnson was 26 years of age when he was convicted in Prince George's County of murder, kidnapping, first degree rape, first degree sexual offense, robbery with a deadly weapon, and use of a handgun. He and a companion kidnapped a 13-year-old girl in the District of Columbia and brought her to Prince George's County. She was raped and sodomized. Property in her

possession was taken. Johnson fired a sawed-off shotgun point blank into her back and threw her body over a bridge. A jury deadlocked. Thus, a life sentence was imposed as required by Art. 27, § 413(k)(2).

*Lawrence Johnson.* Johnson was 19 years of age at the time of his offense. He and another gained entry to a dwelling house through a basement window. Once inside they went up the basement stairs to the first floor where they discovered the presence of the victim. She was a 78-year-old woman, small in stature and weighing ninety pounds. She was home alone. When their demands for money were not satisfied, they grabbed her and shoved her into a spare bedroom. In the course of this episode the victim was brutally beaten with a broom handle, stomped on and kicked, tied and strangled to death. The jury found as an aggravating circumstance that the murder was committed while committing or attempting to commit robbery, arson or rape or sexual offense in the first degree. Mitigating circumstances found were that Johnson was not the sole proximate cause of the victim's death and that his co-defendant was sentenced to life. The jury sentenced to death.

*Dean Hugh Oliver.* Oliver was 22 years of age at the time of his offense. The trial judge described the facts:
"In the early morning hours of November 22, 1980 the home of Paulette and Stephen Lintner was the subject of burglary at 10101 Frederick Road, Ellicott City, Maryland. During the course of the burglary, Mrs. Lintner was tied, beaten, disrobed, sexually assaulted, and repeatedly knifed, resulting in her death. This occurred between 12:30 A.M. to 2:30 A.M. on said date. Two persons were apprehended for the crime, one Emerson Baxter and the defendant. Baxter blamed the defendant for the death of the victim and the defendant denied being present. At the time of the incident Mr. Lintner was out of the country on business for his employer, the United States Government."

The jury convicted Oliver of murder and felony murder, robbery with a deadly weapon, robbery, attempted rape first degree, first degree sexual offense, burglary, assault, and battery. No aggravating circumstances were found. Thus, the sentence was life.

*Annette Louise Stebbing.* Stebbing was 19 years of age at the time of her offense. She was convicted by a Harford County jury of murder in the first degree, rape in the first degree, robbery, and first degree sexual offense. Stebbing and her husband offered the victim a ride to a bus stop. They all entered a van. Instead of going to the bus stop, Stebbing and her husband took the victim out into Harford County where Stebbing held the victim in the back of the van while Stebbing's husband raped her. The victim was screaming throughout the event so Stebbing placed her hands on the victim's throat and strangled her to death. After the victim was dead Stebbing and her husband turned the body over and the husband then performed sodomy upon the victim. They went home, slept in the van with the victim in it, and carried her body around until the following day when they dumped it into a sewer at Fell's Point in Baltimore City. As an aggravating circumstance the jury found that the murder was committed while committing or attempting to commit robbery, arson or rape, or sexual offense in the first degree. As a mitigating circumstance the jury found that Stebbing had not previously been convicted of a crime of violence, had not entered a plea of guilty or nolo contendere to a charge of a crime of violence, and had not been granted probation on stay of entry of judgment pursuant to a charge of a crime of violence. No other mitigating factors were found. The jury sentenced to death.

*James Russell Trimble.* Trimble was 17 years and 8 months old at the time of his offense. He was one of a group of young men who kidnapped the 22-year-old victim and another young woman. After the gang rape of the victim, Trimble clubbed her with a baseball bat and later slashed her throat to make certain that she was dead. He

elected sentencing by a judge. Aggravating circumstances found were that the victim was a hostage taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct and that the defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree. The trial judge found as a mitigating circumstance that Trimble had not previously been found guilty of a crime of violence, had not entered a plea of guilty or nolo contendere to a charge of a crime of violence, and had not been granted probation or stay of entry of judgment pursuant to a charge of a crime of violence. He also found the youthful age of the defendant at the time of the crime to be a mitigating factor. Under "8. Other Mitigating Circumstances" the trial judge listed "antisocial personality" and "substance abuse (by history)." The sentence was death.

██ Pursuant to the mandate of Code (1957, 1982 Repl. Vol.) Art. 27, § 414(e) as to factors to be considered by us relative to the sentence, we find in this case that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; the evidence supports the jury's finding of a statutory aggravating circumstance under § 413(d); the evidence supports the jury's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. It thus follows that the death sentence must be affirmed.

JUDGMENT AFFIRMED.

ELDRIDGE, Judge, dissenting:

More than two hundred and sixty years ago William Hawkins, citing earlier authority, repeated the settled common law rule that an accused "ought not to be brought to the Bar in a contumelious Manner; as with his Hands tied together, or any other Mark of Ignominy and Reproach;

nor even with Fetters on his feet, unless there be some Danger of a Rescous or Escape." 2 Hawkins, *Pleas of the Crown* 308 (1716, 1721).[1] Just one month ago, the Supreme Court of the United States unanimously reiterated that, under the Due Process Clause of the Fourteenth Amendment, "shackling" is "the sort of inherently prejudicial practice that ... should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn,* —— U.S. ——, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986).

The majority today sanctions the shackling of defendant, at a capital sentencing trial before a jury, based upon little more than the desire of a local sheriff's office. The Court's affirmance of the defendant's death sentence under these circumstances cannot, in my view, be squared with the above-quoted common law and constitutional principles or with the very cases cited in the majority opinion.

The principal ground for the majority's decision is its conclusion that the determination of whether to shackle a defendant lies within the trial judge's discretion, and that there was no abuse of discretion in this case. The majority points to institutional difficulty with Bowers, all of which had taken place before his earlier trial when he was convicted of murder, and to the fact that Bowers had already been found guilty of the murder. The chief problem with the majority's reasoning is that the trial judge utterly failed to exercise discretion. Furthermore, there was no factual basis shown for the decision to shackle Bowers.

The trial judge, who ordered Bowers to stand trial in fetters before the sentencing jury, was the same judge who had previously conducted the trial at which Bowers was convicted. Thus he was familiar with Bowers's courtroom deportment. No shackles were required at the earlier trial.

---

**1.** In the middle of the thirteenth century, the same principle was set forth in Bracton's *De Legibus et Consuetudinibus Angliae* (c. 1250). *See* the text and translation in 2 S. Thorne, *Bracton On The Laws And Customs Of England* 385 (1968).

The judge at that time had knowledge of Bowers's behavior in prison. The only difference between the earlier trial and this trial is that the judge also had before him a memorandum from the sheriff's office which recommended leg irons and stated that Bowers was considered an "escape risk" due to his convictions and his prison record. The judge acknowledged the contention of Bowers's counsel that Bowers had been cooperative and had committed no acts indicating a security risk. Despite the lack of fresh signs that Bowers would turn violent in the courtroom, the judge ruled as follows:

"I conclude that there is some basis for the concern of · the Sheriff's Office, and even though maybe *given the same set of facts and circumstances I might reach a different conclusion, nevertheless these individuals are charged with courtroom security,* and I am not saying I would have made a different decision on the issue, but I am just saying it may be that given all the facts and circumstances *I might have made a different decision.*

"Nevertheless, *I don't feel that I ought to second guess the individuals charged with security* where there has been some prior indication of difficulty involving the Defendant.

\* \* \* \* \* \*

"I conclude, based on everything that has been presented to me, that *the Sheriff's Office is not being unreasonable or arbitrary* in their decision in this instance, and for that reason I feel that I should not countermand their direction to the court security people. So that motion is denied." (Emphasis added).

This ruling, instead of being an exercise of the trial judge's discretion, was simply a determination that the sheriff's office was "not being unreasonable or arbitrary" and an abdication of responsibility to that office. The judge expressly stated that he should not "second guess the individuals charged with security." He acknowledged that under "the same facts and circumstances I might reach a

different conclusion." It defies logic to view the trial judge's action here as an exercise of *the judge's* discretion.

The cases, including many cited by the majority, make it clear that a trial judge may not delegate this discretion to court security personnel. As Judge Harrison Winter put it for the United States Court of Appeals for the Fourth Circuit in *United States v. Samuel*, 431 F.2d 610, 615 (4th Cir.1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971):

> "As a discretionary matter, the district judge's decision with regard to measure for security is subject to limited review to determine if it was abused. We stress that the discretion is that of the district judge. *He may not, as is suggested at one part in the record before us, delegate that discretion to the Marshal.* Of course, he should consult with the Marshal when other than ordinary security such as the general presence of guards in the courtroom is contemplated, and he may rely heavily on the Marshal's advice as to what may be required since it is the Marshal who has the experience in the keeping of prisoners and who must provide the guards and bear the major responsibility if untoward incidents occur." (Emphasis added).

To the same effect is *Woodards v. Cardwell*, 430 F.2d 978 (6th Cir.1970), *cert. denied*, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971). There the trial judge abdicated his discretion entirely, saying, "It is up to the Sheriff." 430 F.2d at 981. The United States Court of Appeals for the Sixth Circuit held that this ruling constituted a denial of due process. *Id.* at 980–982. *See, State v. Moen*, 94 Idaho 477, 491 P.2d 858, 860 (1971) ("Although the sheriff has some initial responsibility for determining whether an accused should be handcuffed during a jury trial, the trial judge must ... decide the question for himself."); *State v. Evans*, 169 N.W.2d 200, 210 (Iowa 1969) (judge's deference to sheriff held improper); *Commonwealth v. Brown*, 364 Mass. 471, 475, 305 N.E.2d 830, 834 (1973) (the judge "may attach significance to the report and recommendation of ...

[the sheriff], but he may not pass his responsibility to that official"); *State v. Roberts,* 86 N.J.Super. 159, 206 A.2d 200 (1965) (judge preferred not to shackle, but "they [sheriffs] asked for it and I had to do it," and the conviction was reversed); *People v. Mendola,* 2 N.Y.2d 270, 159 N.Y.S.2d 473, 140 N.E.2d 353, 356 (1957) (". . . while the Sheriff . . . has the initial responsibility of determining whether an accused should be handcuffed during a trial, the trial judge must . . . decide the question for himself"); *State v. Carter,* 53 Ohio App.2d 125, 372 N.E.2d 622, 628 (1977) ("In erroneously concluding that the responsibility for the shackles was that of the sheriff and not the court, it is apparent the court did not exercise any discretion upon the issue," thus requiring the judgment to be reversed); *Sparkman v. State,* 27 Wis.2d 92, 133 N.W.2d 776, 779 (1965) ("It is for the trial court rather than the police to determine whether such caution is necessary to prevent violence or escape").

In addition to not abdicating their responsibility, courts have also required that trial judges in jury cases, *inter alia,* articulate the reasons for employing shackles or similar security measures. The Supreme Court of North Carolina, in *State v. Tolley,* 290 N.C. 349, 368–369, 226 S.E.2d 353 (1976), set forth this principle as follows:

"Whatever the basis for his decision, however, the unquestioned rule is that when the trial judge, in jury cases, contemplates the necessity of employing unusual visible security measures such as shackles, he should state for the record, out of the presence of the jury, the particular reasons therefor and give counsel an opportunity to voice objections and persuade the court that such measures are unnecessary. While the cases have established no definitive rule as to the exact form of evidentiary hearing to determine whether shackling of the defendant is necessary, the most prevalent conclusion is that the hearing may be informal and that the ordinary rules of evidence need not be observed, although the trial judge may decide, particularly where the need for physical restraint is controverted, to conduct a full evidentiary

hearing with sworn testimony and formal findings of fact. In any event, a record must be made which reflects the reasons for the action taken by the court and which indicates that counsel have been afforded an opportunity to controvert these reasons and thrash out any resulting factual questions. Only in this manner can there be preserved a meaningful record from which a reviewing court may determine whether the trial court abused its discretion."

The trial judge in the instant case articulated no reasons which would justify making the defendant Bowers wear leg irons during the entire trial. As previously discussed, the judge simply deferred to the concerns of the sheriff's office.[2] There was utterly no reference to any conduct by Bowers subsequent to the prior trial which might have justified the shackling.

In addition to holding that the trial judge did not abuse his discretion, the majority "see[s] yet another reason for an affirmance on this issue and that is that prejudice has not been shown." The majority goes on to cite *Veney v. State*, 251 Md. 182, 190–197, 246 A.2d 568 (1968), *cert. denied*, 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969), and *Seidman v. State*, 230 Md. 305, 323–325, 187 A.2d 109 (1962), *cert. denied*, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031 (1963), where voir dire was found "adequate to screen out any prejudice." Of course, as the majority opinion goes on to mention, these cases dealt with pretrial publicity and not with shackling a defendant throughout a jury trial. Unlike pretrial publicity, shackling a defendant before a jury is an "inherently prejudicial practice that . . . should be

---

**2.** The trial judge did mention that he was aware of "some difficulty that occurred when" Bowers was incarcerated "while he was awaiting trial for the offense" previously. This, however, was not given as a reason which in the trial judge's judgment warranted shackling; instead, it was mentioned as being "some basis for the concern" of the sheriff's office. Moreover, as pointed out before, this conduct occurred prior to the first trial, and shackling at that trial was not deemed necessary.

permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn, supra,* 106 S.Ct. at 1346. That it is prejudicial per se when a defendant is tried in chains before a jury, is pointed out in numerous cases cited by the majority. *See, e.g., Kennedy v. Cardwell,* 487 F.2d 101, 107 (6th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974) (citing cases); *People v. Duran,* 16 Cal.3d 282, 127 Cal.Rptr. 618, 545 P.2d 1322 (1976); *State v. Tolley, supra,* 290 N.C. at 366–367, 226 S.E.2d 353. Because of the prejudice, the prosecution bears the burden of showing the necessity for physical restraints. *Kennedy v. Cardwell, supra,* 487 F.2d at 107; *State v. Coursolle,* 255 Minn. 384, 389, 97 N.W.2d 472, 477 (Minn.1959) (requiring that the conduct of the prisoner evince "immediate necessity" for use of shackles).

While not explicitly set forth as a basis for affirmance, the majority suggests that the reason for the general rule against shackling a defendant is that it is inconsistent with the presumption of innocence, and that in a capital sentencing proceeding there is no presumption of innocence because the defendant has already been convicted of murder. Nevertheless, inconsistency with the presumption of innocence is not the only reason for the rule against shackling a defendant.

As Bowers's attorney pointed out in arguing against trying him with leg irons around his ankles, whenever Bowers would need to approach the bench or the jury during allocution, the leg cuffs impeding his movement would be obvious. Counsel stated: "We feel it is highly prejudicial. It gives the appearance that he is an animal, and we are somewhat concerned about that." It is well recognized that physical restraints such as handcuffs or leg irons may impair the ability of a defendant to communicate with judge, jury and counsel, may otherwise distract the defendant, and may prejudice a defendant in the eyes of the jury.

Some of the reasons for not trying a defendant in shackles were forcefully set forth by the Supreme Court in *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The Court there stated (397 U.S. at 344, 90 S.Ct. at 1061):

> "But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint."

These reasons are fully applicable to a capital sentencing proceeding before a jury.

During the sentencing phase of a death penalty case the jury performs the difficult task of weighing aggravating and mitigating factors, including whether or not the defendant poses a continuing threat to society. Art. 27, § 413(g)(7). Although the defendant is no longer presumed innocent of the murder for which he has been convicted, *see Elledge v. State*, 408 So.2d 1021, 1022–1023 (Fla.1981), *cert. denied*, 459 U.S. 981, 103 S.Ct. 316, 74 L.Ed.2d 293 (1982), he is presumed innocent of any extraneous and unproven propensities which shackles may suggest.[3]

The issue to be decided by the jury at a capital sentencing proceeding is as important as any issue determined at a regular criminal trial. It is whether or not the defendant is

---

**3.** The *Elledge* case is cited by the majority as a capital sentencing proceeding where the court upheld trying the defendant in shackles. In *Elledge*, however, the defendant had threatened to attack the trial judge's bailiff, and the Supreme Court of Florida relied on this circumstance, 408 So.2d at 1023. Thus *Elledge* furnishes no support for the majority's decision in the instant case.

to be put to death. An accused is ordinarily entitled to have the jury make this determination without the prejudicial effect and "inherent disadvantages and limitations" [4] of leg irons. As the Supreme Court has pointed out, such restraining devices should be used only as a "last resort" [5] and "justified by an essential state interest specific to each trial." [6] In light of these standards, the use of shackles in the present case cannot be justified.

I would vacate the death sentence and remand the case for a new sentencing proceeding.

COLE and McAULIFFE, JJ., have authorized me to state that they concur with the views expressed herein.

---

4. *Illinois v. Allen,* 397 U.S. at 344, 90 S.Ct. at 1061.

5. *Ibid.*

6. *Holbrook v. Flynn,* 106 S.Ct. at 1346.